UNITED STATES of America,

v.

Ernest G. ROCKWELL.

Crim. A. No. 85–156.

United States District Court,
W.D. Pennsylvania.

Jan. 20, 1988.

George Schumacher, Federal Public Defender, Pittsburgh, Pa., for Rockwell.

Dante G. Bertani, Greensburg, Pa., for petitioner Jessup.

J. Alan Johnson, U.S. Atty., Att: Bruce Teitelbaum, AUSA Pittsburgh, Pa., for U.S.

## OPINION

GERALD J. WEBER, District Judge.

In this criminal forfeiture proceeding, third parties have asserted an interest in the subject property. The matter was tried to the court and we have received briefs.

## FACTS

On July 17, 1985, Ernest Rockwell pled guilty to one count of tax evasion and a charge of engaging in a continuing criminal enterprise involving illegal trafficking in narcotics, in violation of 21 U.S.C. § 848(a). Rockwell has subsequently testified as a government witness in several criminal prosecutions of his former narcotics associates.

As part of the plea agreement, Rockwell forfeited any interest in property procured with drug proceeds, specifically including all right, title and interest in Indian Lake Park.

Indian Lake Park is a mountain site consisting of approximately 16 acres, a mountain lake and various improvements. In 1974, Harry Jessup, a petitioner here, executed a sales agreement with the then-owners whereby Jessup would pay a total of $47,000 in several annual installments in order to acquire title to the property.

When the sales agreement was executed in 1974 there was only one structure on the site, a 1–story concrete block shell. After the execution of the sales agreement, but before transfer of the title, Jessup began making further improvements to the property.

According to Jessup, his purpose has always been to convert the site into a recreational park providing boating, fishing, picnicking and family amusements. To this end he began making improvements to the site, including the erection of various structures.

Jessup quickly ran into a snag. A local ordinance prohibited the erection of more than one structure on the site. However, the ordinance apparently did not apply to non-profit organizations, and so in 1976 Jessup created the Westmoreland Recreation Society, Inc., a non-profit corporation registered with the Commonwealth and having as its stated purpose the preservation and development of the natural resources of Indian Lake Park. Harry Jessup was and is president and principal shareholder in the Society.

The sales agreement was assigned to the Society, and ultimately, when the last installment payment was made by Jessup, the deed was transferred to the Society. Under the auspices of this non-profit corpo-

ration, Jessup continued to make improvements in the site, mostly in the erection of various structures, including offices, picnic pavilions, garages, a concession stand, and a modular chalet. All these structures were erected prior to Rockwell's initial involvement in August, 1983.

By Jessup's own admission, these various improvements were made with a minimal cash outlay. The structures were constructed almost entirely of used material, obtained by a demolition and salvage business which Jessup ran. The labor was mostly Jessup's, with assistance provided by unpaid volunteers. Improvements to the lounge were made by a third party at no cost to Jessup, and Jessup acquired full title to all those improvements when that party defaulted on the lease. Other expenses were paid out of money which Jessup claims was a gift from a third party for use on the park.

In August 1983, despite the various structures erected, the Society was no closer to opening as the envisioned amusement and recreational park. Neither the lounge nor the concessions were open, and many of the structures remained unfinished. There was no means of transporting persons from the park entrance to the various facilities, and no fence to restrict access to the site.

At that time Jessup was seeking investors who would bring money to the project. In August 1983 he was introduced to Ernest Rockwell who expressed interest in being the bankroll for the project.

Although the park as a whole required considerable work, it was agreed that the focal attraction was to be a large waterslide of the type now popular at many amusement parks. With Rockwell's money, work began in earnest. A slide was purchased and much of it delivered to the site. A topographical survey of the waterslide site was performed, and a bathhouse, deck, splashdown pool, walks, fencing and the support pillars for the slide were constructed. It is not disputed that all the improvements at the one acre waterslide site were paid for by Rockwell.

It is also undisputed that Rockwell paid for other improvements outside the one acre waterslide site. Most notable was the erection of a fence around the perimeter of the entire 16 acre site. Such a fence is of course a necessity to a venture which seeks to charge admission. Rockwell also paid for concrete floors in 1 or 2 buildings erected by Jessup which until that time had dirt floors. In addition, Rockwell claims to have paid for other improvements outside the waterslide site which Jessup denies.

Rockwell has testified that he invested $357,000 in Indian Lake Park in the period between August 1983 when he met Jessup and December 9, 1984 when he went to jail. Rockwell claims he was to be an equal partner with Jessup in the park. Jessup on the other hand estimates Rockwell's total investment at $170,000 and contends that Rockwell's interest was limited to a 10 year lease on the waterslide and a 50% share of the waterslide profits. These discrepancies form the core of this case.

After Rockwell's guilty plea, on the basis of certain admissions of Rockwell, we concluded that Rockwell had invested the proceeds of a continuing criminal enterprise in the park and his interest in the park was therefore subject to forfeiture under 21 U.S.C. § 848(a) and § 853. Pursuant to the court's order the United States Marshal seized the subject site.

Jessup and the Society filed a timely petition to vacate the seizure order, asserting right, title and interest superior to Rockwell's. While petitioners do not deny that Rockwell invested money in the park, or that the money was the proceeds of drug trafficking, petitioners dispute the amount which Rockwell claims to have invested, and the scope of that investment in relation to the park as a whole. In this manner petitioners seek to limit the amount to be forfeited.

A hearing on the petition was held, at which time both sides presented evidence of the relative investments of the principals. On the basis of that record we now address the issues raised by the petition.

## DISCUSSION

A person convicted of engaging in a continuing criminal enterprise under 21 U.S.C. § 848(a) will find certain of his property subject to forfeiture under 21 U.S.C. § 853. In the present case defendant Rockwell admitted that he invested drug proceeds in Indian Lake Park and accordingly this court ordered the forfeiture of his interest.

In such forfeiture proceedings, a third party may assert a legal interest in the subject property in the manner prescribed by 21 U.S.C. § 853(n). Evidence on the third party's claim is to be taken by the court without a jury, 21 U.S.C. § 853(n)(2), and both the petitioner and the government have the opportunity to present evidence and to cross examine opposing witnesses. 21 U.S.C. § 853(n)(5).

In such proceedings, the petitioner bears the burden of proving by a preponderance of the evidence that he has superior title in the subject property, or that he is a bona fide purchaser for value who bought without knowledge that the property was subject to forfeiture. 21 U.S.C. § 853(n)(6). In the present case, the petitioners do not purport to be bona fide purchasers who bought from Rockwell, but rather assert that they had prior and superior title in the property. They also seek to minimize both the scope and amount of Rockwell's investment.

We first address the dispute over the dollar amount of Rockwell's investment. Rockwell recalls a total investment of $357,000 while Jessup estimates it at $170,-000, but neither man has much supporting documentary evidence.

All receipts for work done at Rockwell's expense were destroyed by Rockwell, with Jessup's knowledge, after Jessup received a grand jury subpoena. The receipts were destroyed to keep them from the hands of the Grand Jury. Jessup admits he kept no record of expenses nor any log of Rockwell's many cash contributions. Jessup's estimate is based solely on his recollection.

Rockwell has produced a looseleaf binder which he claims contains a tally of his investments in the park. According to Rockwell he maintained a running total of the cash he gave to Jessup for the park, entering the amount of each installment, adding it to the current total, and entering the updated total. When these tabulations filled a page, Rockwell would transfer the current total to the top of the next page and discard the just completed page.

Rockwell claims that page 1 in this binder is the last page of the running total of his investments in Indian Lake Park. There is a figure of $309,000 at the top of the page and various amounts are then added, producing successive totals, culminating in the amount of $328,100 at the base of the page. A notation appearing next to one of the amounts added to the running total reads "end of fencing, fuel & cylinders." This notation is consistent with the undisputed fact that Rockwell paid for fencing, the waterslide supports (i.e., cylinders) and construction expenses, (i.e., fuel for construction machinery), among other things. This page thus appears to be what Rockwell claims it to be, a running tabulation of his investment in the park.

Rockwell claims his total investment to be $357,000, but he can produce no supporting evidentiary material for that figure. The second page in the binder is of no import: it is not in the form of a running tabulation like page 1; when added to page 1's total it does not total $357,000, and Rockwell could not identify the figures on page 2 as representing park investments. In the absence of supporting evidentiary material, we cannot accept a figure for Rockwell's investment higher than the $328,100 total shown on page 1 of the binder.

Without documentary support, Jessup estimates Rockwell's total investment at $170,000. However, Jessup's estimates of specific items paid for by Rockwell yield a considerably higher total, between $215,000 and $230,000. In addition, Rockwell claims to have paid for various items, such as a backhoe, a train, air conditioning for the lounge, and excavation and fill for the train's track bed, all of which Jessup denies.

840

■ The burden of proof under 21 U.S.C. § 853(n)(6) falls on petitioners. The absence of receipts, logs or other records, which would normally be maintained in such a business, places petitioners at a considerable disadvantage in satisfying their burden. Jessup cannot counter the government's evidence with anything but oral testimony consisting of rough and inconsistent estimates and self serving denials. Whether the absence of documentation is due to stupidity, neglect or an intentional effort to mislead, the burden falls on petitioners and they fail to satisfy it.

■ There is also considerable question concerning Jessup's credibility and his good faith in this matter. Jessup dealt with Rockwell exclusively in large amounts of cash delivered in brown paper bags, yet kept no records and claims that his suspicions were never aroused. It is inconceivable that even the most trusting and naive business partner (neither adjective by the way being applicable to Jessup) would incur considerable expenses and receive varying amounts of cash, all with business and tax repercussions, without maintaining *any* records. It is also incredible that anyone could participate in transactions involving unholy amounts of cash, the largest by Jessup's description being $90,000, without having some doubts or suspicions. Jessup's professed innocence in this unusual course of dealing is not credible and casts serious doubt on his veracity on all other matters.

We also note on the issue of credibility that Jessup has been convicted of income tax evasion on two occasions. The studied avoidance of any paper trail in his dealing with Rockwell evidences an intention to continue such practices. It is also undisputed that Jessup purchased several cashier's checks with Rockwell's money in such a manner and for no other purpose than to avoid IRS reporting requirements. It is also clear that Jessup has been unable to produce any business or financial records concerning the Society, although subject to a subpoena for such documents.

For the reasons stated, we conclude that Jessup's testimony is not worthy of credence. While Rockwell is no altar boy, he has little to gain at this point since his property is forfeit and he has already cooperated extensively. Furthermore, the figure of $328,100 is the only figure supported by a credible document, the running tabulation in Rockwell's binder, and we therefore conclude that Rockwell's investment in Indian Lake Park totals $328,100.

The second question is the scope of Rockwell's interest in the park. Rockwell claims he was investing in the park as a whole and was to be a 50/50 partner in the entire venture. Jessup on the other hand contends that Rockwell's investment and interest were limited to the one acre waterslide site, and therefore the only property subject to forfeiture is Rockwell's 10 year leasehold interest in that one acre site.

■ Petitioners rely most heavily on the lease. Its terms specifically limit the lessee's interest to a 10 year lease of the one acre waterslide site, and the accompanying memorandum limits the lessee to a 50/50 interest in the profits from the waterslide alone, and not the park as a whole.

But there are considerable questions concerning this lease. First of all, Rockwell is not identified in the lease. The lessee is Linda Hineman, one of the several names by which Rockwell's female companion is known. Jessup executed the lease on behalf of the Society knowing that the lease concealed the identity of the true investor. Also critical to an understanding of the circumstances is the timing of the lease. Although the lease itself is undated, the accompanying memorandum and the time records of counsel who drafted the documents indicate the date to be July, 1984. This was long after Rockwell's investment had begun in earnest and less than 2 months before Rockwell's first federal indictment. Most importantly, the terms of the lease did not comport with the parties' course of dealings in those prior 10 months.

Petitioners make much of the fact that most of Rockwell's money had gone to improvements for the one acre waterslide site. But significant and costly improvements had been made to other parts of the park and paid for with Rockwell's money.

Most notable is a fence which surrounds the entire 16 acre site. While not necessary to the waterslide, which was enclosed by its own fence, it was critical to the function of a park which was to charge for admission. It is also undisputed that Rockwell paid for concrete floors in 1 or 2 buildings, outside the waterslide site, which had previously been mere shells with dirt floors. Rockwell also claims, and Jessup denies, that he paid for a train, a backhoe, air-conditioning for the bar and excavation and fill for the railroad's roadbed.

More important than the allocation of dollars to particular sites is the relation of the waterslide to the park as a whole. The waterslide was to be the park's focal attraction. Without the slide, Indian Lake was just another picnic ground and fishing hole. With it, it would become an attraction to draw paying customers. It is impossible then to divorce the waterslide site from the park as a whole because the value of the two are inextricably intertwined and this economic reality is consistent with Rockwell's understanding that he was to be an equal partner in the entire venture. It is the only rational explanation for why Rockwell would expend even one unnecessary dollar outside the purported one acre leasehold, as he undeniably did with the large perimeter fence and the concrete floors. It is the only rational explanation for why Rockwell would invest in the park in one year 3 times as much cash as Jessup had invested in eight.

The discrepancy between events and the terms of the lease, the circumstances of its tardy drafting and execution on the eve of Rockwell's indictment, the continuation of the efforts to avoid a paper trail identifying the investor, and the simple fact that we do not believe Jessup's testimony to be worthy of credence, compel the conclusion that the lease was a sham designed to minimize the apparent scope of Rockwell's involvement. Rockwell was, by virtue of his paying for items not limited to the waterslide site, and by the interdependent character of the park and slide, an investor in the entire venture and not in some discrete portion of it.

Therefore, the entire parcel known as Indian Lake Park, that is roughly that portion circumscribed by the perimeter fence, and all attachments and improvements thereto, is subject to forced sale to recover the amount of drug proceeds invested in the property, and the costs incurred by the United States Marshal in maintaining it. As we concluded above, Rockwell's total investment was $328,100. This figure must be reduced by $105,000, the approximate amount invested in unassembled waterslide parts which were independently seized. Therefore, the United States is entitled to the forfeiture of $223,100 of the proceeds of the sale of Indian Lake Park, plus Marshal's costs.

■ Petitioners do not come to this proceeding with clean hands. The nature of Jessup's dealings with Rockwell, the extensive use of large amounts of cash, the studied efforts to avoid a paper trail and to conceal Rockwell's involvement all compel the conclusion that to permit petitioners to participate equally in the sale proceeds would permit Jessup to profit unjustly from the influx of money he must have known was tainted. Therefore, the United States is to recover first the full sum of $223,100 and Marshal's costs from the sale proceeds, with the balance remaining, if any, to be paid to the petitioner Society.

### ORDER

AND NOW in accord with the accompanying Opinion it is hereby ORDERED:

1) That the parcel known as Indian Lake Park, that is that area circumscribed by the perimeter fence, is subject to forced sale to permit the United States to recover the sums described below.

2) That the United States is to recover from the proceeds of said sale the amount of $223,100 being the investment of Ernest Rockwell which was forfeited pursuant to 21 U.S.C. § 848(a) and § 853.

3) That the United States is to recover from the proceeds of said sale the amount of costs incurred by the Unit-

ed States Marshal's Service in seizing and maintaining the property.

4) Any balance remaining from the proceeds of said sale after recovery by the United States of the forfeit interest and costs shall be paid to the Westmoreland Recreation Society, Inc.