UNITED STATES of America,
Plaintiff–Appellee,

v.

Shia BEN–HUR, Defendant–Appellant.

Nos. 93–2064 and 93–2429.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 8, 1993.

Decided March 30, 1994.

Joseph R. Wall, Asst. U.S. Atty. (argued), Milwaukee, WI, for plaintiff-appellee.

David J. Cannon (argued), Michael, Best & Friedrich, Milwaukee, WI, for defendant-appellant.

Before POSNER, Chief Judge, KANNE, Circuit Judge, and REINHARD, District Judge.*

* The Honorable Philip G. Reinhard of the United States District Court for the Northern District of Illinois, sitting by designation.

REINHARD, District Judge.

The defendant, veterinarian Shia Ben–Hur, pled guilty to one count of distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1). Pursuant to 21 U.S.C. § 853(a)(2), Ben–Hur in a written plea agreement forfeited "any right, title, and interest" he held in certain real property located at 10800 North Port Washington Road, Mequon, Wisconsin and known as the North Shore Animal Hospital ("the property"), which he had used to facilitate the commission of the cocaine distribution. When the government later moved for entry of an order of forfeiture of the property, however, Ben–Hur objected, contending that while he did own the property at the time of the forfeiture proceedings, he had not owned it on the relevant date for purposes of section 853, the date of commission of the offense. The district court found Ben–Hur did own the property on the date of commission of the offense and ordered its forfeiture. It is from this order that Ben–Hur now appeals.

## I. BACKGROUND

Ben–Hur and his former wife, Judith Ben–Hur, acquired the property by warranty deed on July 29, 1966, which deed was recorded in the register's office for Ozaukee County, Wisconsin. Judith Ben–Hur later quitclaimed her interest in the property to Ben–Hur on September 18, 1981, which transaction was also recorded.

The next series of related transactions with regard to the property, which occurred on June 28, 1982, is the most significant with respect to the issue in the present case. On that day, Ben–Hur, as vendor, entered into a land contract for the property with David L. Husman, as trustee for an unidentified trust, as vendee. Under the terms of the land contract, the final payment was due July 15, 1987; and Husman could not prepay the unpaid balance before that date without Ben–Hur's permission. Until payment under the contract was complete, Husman was not permitted to transfer, sell, or convey any inter-

est in the premises without Ben–Hur's permission.

On June 28, 1982, Ben–Hur and Husman also entered into an agreement by which Ben–Hur acquired a right of first refusal over the sale property and the right to approve in advance any lien on or encumbrance of the property by Husman. Ben–Hur purchased this right of first refusal on behalf of North Shore Animal Hospital, Inc., a status he claimed on a number of occasions and which was apparently interchangeable with his status as an individual. On that same day, Ben–Hur leased the property back from Husman for a term of seven years, ending July 15, 1989. In addition to rent, Ben–Hur agreed to pay all licenses, utilities, maintenance and repairs, insurance, and taxes with regard to the property. According to the terms of the lease, Ben–Hur acquired the right to assign or sublease any or all of the lease without Husman's permission. On June 28, 1982, Ben–Hur additionally executed a promissory note, agreeing to pay to Husman a particular sum of money. The terms of this note explicitly provided that the land contract was not to be recorded. The land sale contract was not, in fact, recorded.

On December 12, 1982, Ben–Hur, on behalf of North Shore Animal Hospital, Inc., acquired from Husman an option to purchase the property. This option could be executed up to May 31, 1988 through written notice accompanied by a check for $25,000.

Ben–Hur obtained a $150,000 loan from the Grafton State Bank on April 15, 1987, using the property as collateral. Not surprisingly, a title search conducted for Grafton State Bank did not reveal the land contract between Ben–Hur and Husman or that any individual other than Ben–Hur held an interest in the property. The mortgage which Ben–Hur signed states that "[Ben–Hur] warrants title to the property, excepting only restrictions and easements of record, municipal and zoning ordinances, [and] current taxes and assessments not yet due." The majority of the proceeds of this loan went to pay off a prior lien on the property by another bank, although $60,700 went to Ben–Hur.

Ben–Hur obtained a $42,291 loan from the First Wisconsin National Bank of Mequon on April 16, 1987, again using the property as collateral. Under the title warranty provision of the mortgage on the property for this loan, Ben–Hur represented in writing that he was the owner of the property and that the only existing lien or encumbrance upon the property was the preceding Grafton State Bank mortgage.

According to Ben–Hur's version of events, at some unspecified time prior to September 28, 1987, Husman's remaining obligations as vendee under the land contract were satisfied by Ben–Hur and Husman offsetting certain obligations between them. The district court neither relied upon nor gave any weight to this factual assertion.

On February 1, 1988, in a personal financial statement Ben–Hur was required to provide under the terms of the Grafton State Bank loan, he represented that he was the sole owner of the property. On March 29, 1988, in a personal financial statement Ben–Hur was required to provide under the terms of the First Wisconsin National Bank of Mequon loan, he represented that he was sole owner of the property.

On May 27, 1988, Ben–Hur sent Husman a letter purporting to exercise the option to purchase acquired on December 12, 1982. The letter stated that a check for $25,000 was enclosed. It made no mention of whether the option was exercised on behalf of North Shore Animal Hospital, Inc.

Ben–Hur obtained a $50,000 loan from the Tri–City National Bank on June 14, 1988, using the property as collateral. In obtaining the loan, Ben–Hur represented in writing that he was the sole owner of the property. A title search contemporaneous with the loan did not reveal the land contract between Ben–Hur and Husman. The proceeds of the loan were issued to Ben–Hur. In a personal financial statement provided later, as required under the terms of the loan, Ben–Hur represented that on April 28, 1989, he was the owner of the property.

On July 5, 1988, Ben–Hur committed the violation of 21 U.S.C. § 841(a)(1) which would form the basis of his February 20, 1991

guilty plea and of the subsequent forfeiture orders, by selling two ounces of cocaine to an undercover FBI agent. The cocaine sale occurred on the property, inside the animal hospital. A title search done on behalf of the FBI on February 2, 1989 showed Ben–Hur as the owner of the property and did not reveal the existence of the land contract.

During June of 1989, Ben–Hur and Husman engaged in a series of transactions by which they purported to transfer title to the property back to Ben–Hur. On June 1, Ben–Hur signed, as president of North Shore Animal Hospital, Inc., an "assignment and acceptance" purporting to "transfer[ ], set[ ] over and assign[ ] all [of North Shore Animal Hospital, Inc.'s] right title and interest in and to that certain option to purchase agreement dated June 28, 1982" to himself individually. On June 12, Ben–Hur signed a quit-claim deed, conveying the property to "Mequon Associates, an Illinois General Partnership" in satisfaction of the June 28, 1982 land contract. On June 13, Husman signed, as general partner for "Mequon Associates, an Illinois General Partnership" a quitclaim deed conveying the property to "Mequon Associates Liquidating Trust." That same day, Husman signed, as trustee of "Mequon Associates Liquidating Trust," a trustee's deed conveying the property to Ben–Hur. That same day, Husman also signed, using the title "trustee," but not identifying what entity he was trustee for, a warranty deed conveying the property to Ben–Hur.

A federal grand jury indicted Ben–Hur on October 23, 1990 on one count of distributing cocaine in violation of 21 U.S.C. § 841(a)(1), based on the July 5, 1988 sale of two ounces of cocaine. The indictment named the property as subject to forfeiture under 21 U.S.C. § 853(a)(2), under which property of a criminal defendant used to facilitate any of a number of crimes, including a violation of section 841(a)(1), must be forfeited. Ben–Hur pled guilty on February 20, 1991. The plea agreement provided that Ben–Hur would "forfeit any right, title, and interest in the property described in the forfeiture provisions of the indictment, and ... take whatever steps are necessary to pass clear title to the government." When the government moved the district court for entry of an order of forfeiture, however, Ben–Hur filed a response in opposition and requested a hearing in regard to the government's motion. The government concedes that while the forfeiture provision in the plea agreement is operative as to any interest in the property Ben–Hur possessed as of July 5, 1988, it is not operative as to any interest held at the time of the plea agreement which was obtained after July 5, 1988. Ben–Hur's position is that the only forfeitable interest in the property he held on July 5, 1988 was a lease and that his ownership interest in the property was obtained after that date.

The district court held evidentiary hearings on the government's motion for entry of an order of forfeiture and Ben–Hur's response. The issue raised by Ben–Hur's response to the government's motion and focused on at these hearings was whether, on the date of the commission of the offense, July 5, 1988, Ben–Hur owned the property, subjecting it to forfeiture. On April 15, 1993, the district court issued its decision and order, determining that on the relevant date, Ben–Hur held an ownership interest in the property and that, therefore, the property was subject to forfeiture. On May 27, 1993, the district court entered an order of forfeiture.

## II. DISCUSSION

The only issue on appeal is the same issue upon which the district court focused: whether under section 853 Ben–Hur held a forfeitable ownership interest in the property on July 5, 1988.

Section 853 is the criminal forfeiture statute. According to section 853(a), any person convicted of certain crimes "shall forfeit to the United States, irrespective of any provision of state law ... (2) any of a person's property used ... in any manner or part, to commit, or to facilitate the commission of, such violation." 21 U.S.C. § 853(a) (1993). Further, as provided in section 853(b), "[p]roperty subject to criminal forfeiture under this section includes—(1) real property ...; and (2) tangible and intangible personal property, including rights, privileges, interests, claims, and securities."

■ Procedurally, a forfeiture authorized by section 853 operates as a sanction against the defendant based upon his conviction. *United States v. Certain Real Property at 2525 Leroy Lane,* 910 F.2d 343, 346 (6th Cir.1990), *cert. denied,* 499 U.S. 947, 111 S.Ct. 1414, 113 L.Ed.2d 467 (1991). As such, forfeiture under section 853 is part of the sentencing and not an element of the crime. *United States v. Simone,* 931 F.2d 1186, 1198–99 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991); *United States v. Herrero,* 893 F.2d 1512, 1541–42 (7th Cir.) (citing with approval *United States v. Sandini,* 816 F.2d 869, 874–76 (3d Cir.1987)), *cert. denied,* 496 U.S. 927, 110 S.Ct. 2623, 110 L.Ed.2d 644 (1990). As a consequence, the government need not prove that property is subject to forfeiture beyond a reasonable doubt, the standard for elements of a crime, but only by a preponderance of the evidence, the standard for sentencing. *Simone,* 931 F.2d at 1199; *Herrero,* 893 F.2d at 1542.

■ Determining what interest in property a criminal defendant holds for section 853 purposes is a matter of state property law, notwithstanding the "irrespective of any provision of state law" language found in section 853(a). *Certain Real Property,* 910 F.2d at 347–49; *see also United States v. One 1989 Stratford Fairmont,* 986 F.2d 177, 179 (7th Cir.1993) (citing *Certain Real Property* for resort to state law to determine property interests, in context of civil forfeiture under 21 U.S.C. § 881(a)). In addition, section 853(c) provides a "relation back" provision which makes the relevant time for determining what interest in property is forfeited by the defendant the moment of "the commission of the act giving rise to the forfeiture," not the moment of the entry of the order of forfeiture. This provision was intended by Congress as one means of avoiding fraudulent transfers of assets which would otherwise defeat the forfeiture statutes. *See United States v. Moya–Gomez,* 860 F.2d 706, 721–22 (7th Cir.1988), *cert. denied,* 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989); *United States v. Reckmeyer,* 836 F.2d 200, 203 (4th Cir.1987).

■ In the present case, the district court examined Ben–Hur's interest in the property at the moment of the commission of the offense on July 5, 1988, in light of Wisconsin property law and all of Ben–Hur's actions with regard to the property. The district court reviewed the Wisconsin doctrine of equitable conversion, as explicated in the recent and leading case of *City of Milwaukee v. Greenberg,* 163 Wis.2d 28, 471 N.W.2d 33 (1991), which Ben–Hur principally relied upon. Under equitable conversion, "ownership" under a land contract does not necessarily follow retention of bare legal title by a land contract vendor. The vendee may become the equitable owner of the property even though the vendor retains legal title in trust as security for any portion of the purchase price not yet paid. *See Greenberg,* 471 N.W.2d at 36; *Mueller v. Novelty Dye Works,* 273 Wis. 501, 78 N.W.2d 881, 883 (1956); and Pomeroy's Equity Jurisprudence, § 368, pp. 686–87 (4th ed. 1918).

Determining that the doctrine of equitable conversion applies only to "standard" and "ordinary" land contracts, as represented by the form land contracts drawn up by the State Bar of Wisconsin, the district court found that the land contract between Ben–Hur and Husman was anything but standard and ordinary and refused to apply equitable conversion to the June 28, 1982 land contract. As a result, the district court found, the property was Ben–Hur's on the date of the commission of the offense and subject to forfeiture under section 853.

The district court made the correct forfeiture determination under section 853 and state law. The "single issue" addressed by the Wisconsin Supreme Court in *Greenberg* was "whether the vendor of real property under a land contract continues to 'own' the property so as to be personally liable for the cost of razing the property" pursuant to Wisconsin statute. 471 N.W.2d at 33–34. In setting out Wisconsin law relevant to the issue, the court first noted that ownership encompasses a number of different interests, but that "[i]t is equally well established ... that ownership should not be equated with possession of legal title." *Id.,* 471 N.W.2d at 35. The *Greenberg* court then resorted to

the ubiquitous metaphor for ownership of property, the "bundle of sticks or rights." *Id.* (quoting *Mitchell Aero, Inc. v. Milwaukee*, 42 Wis.2d 656, 168 N.W.2d 183, 185 (1969)). While removal of "one or more of the sticks" does not change ownership, the court noted, deciding "[w]hat combination of rights less than the whole bundle will constitute ownership is a question which must be determined in each case in the context of the purpose of the determination." *Id.* (quoting *Mitchell Aero*, 168 N.W.2d at 185). Thus, under *Greenberg*, the analytic framework for determining whether a particular party owns property involves two steps. First, it must be decided what "sticks or rights" the vendor retains. *Id.* Second, the "scope, history, and context" of the statute for which the determination is made must be examined to discern whether the legislature which passed the statute intended the land contract vendor to be the "owner" for that statute's purposes. *Id.*

The *Greenberg* court went on to analyze the factual situation in regard to the land contract before it and the Wisconsin statute requiring razing of the relevant property. After noting that, in general, "only the vendee has full rights over the land from the date of the contract," *id.* 471 N.W.2d at 36, and that, in the case before it, "to the extent the property was conveyed to [the vendee] under a standard land contract" the vendor "did not retain any ownership 'sticks or rights' other than bare legal title," *id.* 471 N.W.2d at 37, the court held that for purposes of the razing statute a land contract vendor does not own property subject of a land contract.

In the present case, Husman did not have "full rights over the land from the date of the contract" and it cannot be said Ben–Hur "did not retain any ownership 'sticks or rights' other than bare legal title." Ben–Hur did sign an agreement which purported to be a land contract placing him in the role of vendor and Husman in the role of vendee. When the rights under this land contract and the other contemporaneous agreements entered into by the parties are viewed in the light of Ben–Hur's behavior in regard to the property, however, it is not possible to state that beneficial interest had actually been transferred to Husman and only bare legal title remained with Ben–Hur.

Under the various agreements entered into on June 28, 1982, Husman could not prepay the balance owed under the land contract without Ben–Hur's consent. Husman could not transfer, sell, or convey any interest in the property without Ben–Hur's permission. Husman could not record the transaction in order to protect his interest in the property from Ben–Hur's creditors. In entering into these agreements, Husman hardly received beneficial ownership of the property.

On the other hand, under the June 28, 1982 series of agreements, Ben–Hur (acting for North Shore Animal Hospital, Inc.) possessed a right of first refusal over Husman's ability to sell the property. Ben–Hur remained in possession of the property (under the lease, through July 15, 1989) and was responsible for all licenses, utilities, maintenance and repairs, insurance, and taxes. He could assign or sublease any part of the lease without Husman's consent. Later that same year, Ben–Hur, acting on behalf of North Shore Animal Hospital, Inc., acquired an option to purchase the property, which was essentially a commitment by Husman to keep open an offer to sell the property for a set price for the term of the option; Ben–Hur could accept at any time simply by stating so in writing and including a check.

Equally importantly, Ben–Hur acted as if he retained ownership of the property after entering into this series of transactions. Although Ben–Hur argues that evidence of his behavior in regard to the property is irrelevant, it is, in fact, probative of his intent to retain ownership of the property. He took out loans from three different banks, using the property as security for the loans. In order to secure each loan, he represented that he was sole owner of the property to the respective bank. He reiterated this assertion in personal financial statements he was required periodically to file with the banks.

In short, the June 28, 1982 transactions reflect something far different than the "standard land contract" the *Greenberg* court addressed. Important to the *Greenberg* court was the long line of cases holding that ownership follows "beneficial interest in the

property" and not "bare legal title." 471 N.W.2d at 38; *see also Wall v. Wisconsin Dept. of Revenue,* 157 Wis.2d 1, 458 N.W.2d 814, 817 (Ct.App.1990) (*"Beneficial* ownership ... not mere technical title, is determinative" of ownership. (emphasis in original)). Here, Ben–Hur possessed substantially more than bare legal title. For all intents and purposes, beneficial interest in the property was his.

Further, almost as if anticipating the creative paperwork undertaken by Ben–Hur and Husman, the *Greenberg* court, responding to a "policy" argument made by the City of Milwaukee that parties to a land contract might attempt to manipulate a court's decision through their structuring of transactions, stated that such actions would be significant. "To the extent a vendor and vendee by contractual stipulation attempt to alter the common law rights and duties imposed on them," the *Greenberg* court stated, "such changes must be brought to the attention of the court." *Id.* 471 N.W.2d at 40.

Thus, in evaluating the "sticks or rights" retained by Ben–Hur, the district court arrived at the correct conclusion in holding that the doctrine of equitable conversion was inapplicable and that Ben–Hur still held ownership on July 5, 1988. This conclusion is solidified when the second element of the *Greenberg* test is applied, and the "scope, history, and context" of the statute for which the determination is made are considered.

█ "The federal forfeiture law is designed to impose steep penalties on those who deal in drugs." *Stratford Fairmont,* 986 F.2d at 179. Indeed, the purpose behind criminal forfeiture under section 853 is not just to sanction illegal conduct, but also to strip drug dealers of their economic power. *See Moya–Gomez,* 860 F.2d at 721–23; *Certain Real Property,* 910 F.2d at 348. More specifically, section 853(c)'s "relation-back" provision was intended to prevent avoidance of forfeiture through resort to sham transactions. *See Moya–Gomez,* 860 F.2d at 721–22; *Reckmeyer,* 836 F.2d at 203; *United States v. Figueroa,* 645 F.Supp. 453, 456 (W.D.Pa. 1986) (quoting legislative history of an analogous forfeiture statute, that "the purpose of this provision is to permit the voiding of

certain pre-conviction transfers and so close a potential loophole in current law whereby the criminal forfeiture sanction would be avoided by transfers that were not 'arm's length' transactions"). In addition, section 853(o) commands that the various provisions of section 853 are to "be liberally construed to effectuate its remedial purposes." *Cf. Certain Real Property,* 910 F.2d at 349 ("Creation of an entireties estate just prior to commission of the crime could, as in a bankruptcy context, be challenged in certain instances as a fraudulent conveyance."); *United States v. Rockwell,* 677 F.Supp. 836, 840–41 (W.D.Pa.1988) (in determining forfeitable property interest under section 853, disregarding sham lease).

When these purposes of the federal statute are taken into account, that Ben–Hur owned the property on July 5, 1988 is not even a close call under Wisconsin law. If it had been a close call under Wisconsin property law, the state property law classification which serves the purposes of section 853 would have been chosen, and Ben–Hur would still have been found to own the property. As this court stated in the civil forfeiture context in *Stratford Fairmont,* "When conflicting [state law property right] characterizations are close but imperfect fits, a court should select not the "right" characterization (for there is no one right answer) but the one that best advances the functions of the federal law." 986 F.2d at 179. Here, however, there were no "close but imperfect fits." When the bundle of sticks or rights retained by Ben–Hur is examined and the scope, history, and context of section 853 are considered, Ben–Hur unquestionably owned the property on July 5, 1988, subjecting it to forfeiture.

### III. CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed.

AFFIRMED