UNITED STATES of America,
Plaintiff–Appellee,

v.

Nilesh PATEL, also known as Nick
Patel, Defendant–Appellant.

No. 96–3331.

United States Court of Appeals,
Seventh Circuit.

Argued May 15, 1997.

Decided Dec. 10, 1997.

Barry Rand Elden, Chief of Appeals, Duane J. Deskins (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Nathan Z. Dershowitz (argued), Dershowitz & Eiger, New York City, for Defendant–Appellant.

Before CUDAHY, MANION, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Nilesh Patel pled guilty to count three of a four-court superseding indictment, which charged him with conspiring to possess with the intent to distribute approximately 39 kilograms of cocaine. Patel and the government then presented evidence over three days addressed to certain disputed issues under the United States Sentencing Guidelines. After

hearing the evidence and argument of the parties, the district court found that Patel was responsible for between 50 and 150 kilograms of cocaine, that he should receive a three-level enhancement for his aggravating role in the offense, and that he was not entitled to a two-level reduction for acceptance of responsibility. On the basis of those findings, the district court sentenced Patel to a prison term of 262 months. The court also ordered the forfeiture under 21 U.S.C. § 853 of a Nissan Quest minivan and of $120,505 in cash discovered during a search of Patel's home. In this appeal, Patel argues that the district court's factual findings are insufficient to support its sentencing determinations and that the forfeiture of the cash was erroneous. Although we affirm the district court's forfeiture order, we agree with Patel that the district court's findings are insufficient to support the sentence imposed. We therefore vacate Patel's sentence and remand for resentencing.

## I.

Patel was arrested on April 5, 1995, as he and Charles Lezine were delivering a red vinyl bag that contained six kilograms of cocaine to the trunk of a red Nissan Sentra. The Sentra had been designated for the delivery by Philip Bruno, who unbeknownst to Patel was cooperating with the government. DEA agents subsequently found an additional thirty-four kilograms of cocaine in a room of the Hilton Hotel where surveillance agents had seen Patel and Lezine emerge shortly before their arrests. Moreover, in executing a search warrant at Patel's Skokie, Illinois residence, agents found $120,505 in cash in a brown paper bag under Patel's bed. The agents also recovered from the residence a money counter and a shotgun.

In December 1995, a four-count superseding indictment was returned against Patel. Counts III and IV addressed the six kilograms of cocaine found in the red vinyl bag at the time of Patel's arrest, as well as the thirty-four kilograms recovered from the hotel room.[1] Count III charged Patel with conspiring to possess with the intent to dis-

tribute that cocaine, and count IV charged possession with the intent to distribute. Counts I and II addressed another cocaine transaction between Patel and Bruno on January 25, 1995. The government alleged that Patel had sold five kilograms of cocaine to Bruno on that date, and again, the indictment included both a conspiracy and a possession count. Finally, the indictment included forfeiture allegations under 21 U.S.C. § 853. In particular, the government sought forfeiture of approximately $2 million in cash that was alleged to be connected with the January 25 and April 5 transactions, as well as of the Nissan Quest minivan that Patel had been driving at the time of his arrest.

Shortly before a scheduled trial on these charges, Patel pled guilty to count III of the superseding indictment. During the change of plea hearing, Patel acknowledged that he had conspired to possess with the intent to distribute approximately thirty-nine kilograms of cocaine on April 5. He also agreed to waive a jury trial on the government's forfeiture allegations and to allow the district court to resolve those issues. Pursuant to Patel's plea, the government dismissed the remaining counts of the superseding indictment.

The United States Probation Office subsequently prepared a Presentence Report ("PSR"), which calculated Patel's total offense level at thirty-nine. The PSR recommended that Patel be held responsible for 145 kilograms of cocaine. Although Patel told the Probation Officer that he had only been aware of six of the forty kilograms recovered on April 5, the PSR noted that the transcript of a recorded conversation between Patel and Bruno indicated otherwise. The PSR therefore recommended that Patel be held responsible for the entire forty kilograms. The PSR also recommended that the court attribute to Patel as relevant conduct under U.S.S.G. § 1B1.3(a)(2) the five kilograms he had distributed to Bruno on January 25, 1995. The PSR further noted that a total of approximately $2 million in cash had been seized during traffic stops on December 14, 1994 and February 16, 1995, and that the

---

1. Counts III and IV each referred to thirty-nine kilograms of cocaine, but the parties agreed be-

low that the events of April 5, 1995 actually involved forty kilograms of cocaine.

money represented drug proceeds that were being transported on Patel's behalf. The PSR therefore recommended that the cocaine equivalent of that cash amount (100 kilograms) be attributed to Patel as relevant conduct. The PSR then suggested that Patel be given a three-level enhancement under U.S.S.G. § 3B1.1(b), which applies to supervisors or managers of criminal activity involving five or more participants or that is otherwise extensive. Finally, the PSR recommended that Patel be denied a two-level reduction for acceptance of responsibility under section 3C1.1(a). On that issue, the PSR noted that Patel had failed to truthfully admit essential elements of the offense of conviction, as well as aspects of his relevant conduct. In a written submission, Patel objected to each of these recommendations.

The district court then heard extensive evidence on the disputed sentencing issues and on the forfeiture issue. The government's lead witness was Bruno, who had agreed to cooperate after his arrest in connection with the January 25 transaction. Bruno testified that he first met Patel in 1984, when Bruno had been employed by the Chicago Transit Authority. At the time, Patel was hoping to obtain a concession stand at a CTA subway station, and Bruno testified that Patel had paid him kickbacks for help with that stand. Bruno did not learn of Patel's narcotics trafficking until 1992, when Patel revealed that a bowling alley he owned was used as a "dropoff" for cocaine money due a supplier in California. Patel apparently told Bruno at the time that his cocaine operation was quite profitable and that he was looking to expand his business holdings.

Sometime around March 1994, Bruno was approached by his nephew Philip Ducato about facilitating a cocaine deal. Bruno previously had told his nephew of Patel's involvement with drugs, and Ducato now wanted to obtain five kilograms of cocaine because a friend had a buyer for it. Bruno subsequently met with Patel and learned that his asking price for a kilogram of cocaine was $23,000. That price was considered too high, so the deal was delayed until January of the following year, when the price dropped to $18,000. It was ultimately agreed that Patel

would have the cocaine delivered to a restaurant in Palos Heights, Illinois, where Ducato and his cohorts would be waiting. Patel told Bruno that "a tall colored guy" would make the delivery. At approximately 5:30 p.m. on January 25, 1995, Carlton Miller, an African-American male driving a white Mercury Sable, delivered to the restaurant a brown paper bag containing five kilograms of cocaine. The ultimate buyer of the cocaine turned out to be a government informant, however, so the cocaine ended up in the hands of drug enforcement agents.

Patel and Bruno talked about the cocaine transaction the following day, and Bruno indicated that he would have Patel's money that evening. Patel told Bruno that he would be out of town but that he would call Bruno when he returned. Bruno then arranged to meet Ducato and the others on January 27 at the Palos Heights restaurant for the purpose of obtaining Patel's money. When Bruno arrived at the restaurant, however, he was arrested by drug enforcement agents.

At the time of his arrest, Bruno identified Patel as his supplier and agreed to cooperate with the agents. They asked Bruno first to delay paying Patel the $90,000 owed on the January 25 transaction, and also to arrange an additional cocaine deal. Bruno did as he was told, in the process recording a number of conversations in which he and Patel discussed the money Bruno owed, as well as the logistics of a further transaction. During one of those conversations, Patel told Bruno that he had lost $2 million in drug proceeds that he was required to make up to his supplier. First, Patel's cousin had been stopped by police with $1 million in cash in his vehicle. A couple of months later, Miller had been stopped with another $1 million in the white Mercury Sable. Yet Patel did not seem worried about these losses. He told Bruno, "Easy come, easy go." Patel said that it was easy to make money selling cocaine and that he sometimes made $50,000 to $60,000, or even $100,000 per week.

On April 4, 1995, Bruno told Patel that he finally had the money to pay for the January 25 cocaine. The amount due had risen to $100,000 as a result of the delay, and Patel

reminded Bruno to make the check payable to A & J Capital, Ltd. The two arranged to meet the following day so that Patel could pick up his check and deliver to Bruno an additional five kilograms of cocaine. Patel arrived at Bruno's office shortly after noon the following day. He told Bruno that the cocaine was at the Hilton Hotel and that he would sell Bruno six, rather than five, kilograms so that he would not be required to break up the existing packaging. Bruno then showed Patel a red Nissan Sentra parked behind his office and told Patel to deliver the cocaine to the trunk of that vehicle.

Patel left Bruno's office in a Nissan Quest minivan and drove to the Hilton Hotel. Surveillance agents saw Patel leave the minivan carrying a red vinyl bag. He entered room 401 of the hotel and emerged a short time later with Charles Lezine, who now was carrying the red bag. The two drove back to Bruno's office and parked behind the Nissan Sentra. Lezine left the minivan and walked to the driver's side door of the Sentra, where he released the vehicle's trunk latch and then placed the red vinyl bag inside. At that point, drug enforcement agents arrested Lezine and Patel. They recovered the red vinyl bag and found that it contained six kilograms of cocaine.

Once the government had presented its evidence at the sentencing hearing, Patel testified on his own behalf. He explained that when Bruno had first approached him in December 1994, he had never before been involved in a cocaine transaction or in drug trafficking of any kind. He said that when Bruno told him that he wanted cocaine for his nephew, he put Bruno in touch with Kevin Orme, and that those two had then negotiated the January 25 transaction. Patel testified that because Orme was unfamiliar with Bruno, he had agreed to indemnify Orme if Bruno failed to pay. According to Patel, that is why he was attempting to obtain the amount due from Bruno in March and April of 1995. Patel also denied that the approximately $2 million recovered during the two traffic stops belonged to him. He testified that he told Bruno the money was his only as a way of impressing Bruno. Pa-

tel also denied that the money recovered during the April 5, 1995 search of his home was in any way connected to drug trafficking. He said that the money came from his family's various businesses. That story was supported by the testimony of Patel's brother and a friend.

Having heard the evidence, the district court first made findings addressed to the government's request for forfeiture. The court found the evidence "clear and convincing" that Patel had engaged in large-scale drug transactions. In particular, the court focused on the tape-recorded conversations in which Patel had boasted to Bruno about his cocaine trafficking. Based upon those tape recordings, the court concluded that the approximately $2 million in cash recovered during the two traffic stops belonged to Patel and represented the proceeds of drug trafficking. (Sept. 5, 1996 Tr. at 425–26.) Yet because Patel no longer was in possession of that $2 million, the court focused on the $120,505 found under Patel's bed during the April 5 search of his residence. After rejecting Patel's contention that the money had accumulated from various family businesses, the court concluded that it too represented the proceeds of drug dealing. The court therefore ordered that money forfeited to the government.

On the sentencing issues, the district judge thought it clear that Patel should be assigned responsibility for at least forty-five kilograms of cocaine, representing the forty kilograms involved in the April 5 transaction and the five kilograms he admitted to selling Bruno on January 25. The judge then made the following comments:

> The question then is should the defendant be held responsible for dealing in more than 45 kilograms of cocaine? Since I conclude based upon his testimony that he was involved in large-scale drug transactions, I believe it is reasonable and I find that he was involved in the transaction of more than 50 kilograms of cocaine. I will not go so far as to attribute more than 50 or more than 150. I will simply say and find that he was certainly involved in the dealings involving more than 50 kilograms of cocaine.

(*Id.* at 428.) Based upon that finding, the judge assigned Patel a base offense level of thirty-six pursuant to U.S.S.G. § 2D1.1. He then added three levels for Patel's role in the offense under section 3B1.1(b) because he found that Patel was "clearly a manager in the cocaine business." (*Id.* at 429.) After finding that an enhancement for obstruction of justice was unwarranted under the circumstances, the court denied Patel a two-level reduction for acceptance of responsibility. The district judge offered the following reasons for its conclusion:

> Here I believe that the defendant's late plea should not be held against him, and I do not hold it against him. But I do believe that he failed to reveal relevant conduct. I believe that he denied relevant conduct, which is clearly implied by my earlier findings with respect to his extensive activity in the drug business. Therefore, having failed to admit relevant conduct throughout these proceedings, I do believe that he is not entitled to receive [the] reduction.

(*Id.* at 430.) Patel's total offense level of thirty-nine and criminal history category of I gave him a sentencing range of 262 to 327 months, and the district judge imposed a prison sentence of 262 months.

## II.

Patel argues that the district court's factual findings at sentencing are insufficient to support its conclusions on the disputed issues under the Sentencing Guidelines. Specifically, Patel challenges the sufficiency of the court's findings with respect to the amount of cocaine involved in his offense, the three-level enhancement for his aggravated role, and the denial of a two-level reduction for acceptance of responsibility. Patel also argues that the government failed to establish that the $120,505 seized from his bedroom is subject to forfeiture under 21 U.S.C. § 853. We take up the forfeiture issue first.

**A.**

 Section 853(a)(1) authorizes the forfeiture of, among other things, any proceeds of Patel's narcotics offense or any property derived from those proceeds. The district court ordered the forfeiture of the $120,505 found by drug enforcement agents in a paper bag under Patel's bed during the April 5 search of his home, finding that the money represented the proceeds of the narcotics conspiracy to which Patel had admitted his guilt. The court based its finding primarily on Patel's own tape-recorded statements to Bruno, in which Patel had indicated that it was easy for him to make money selling cocaine, that he sometimes made up to $100,000 per week, and that the $2 million recovered by the authorities during the two traffic stops represented drug proceeds that belonged to him. Moreover, the court rejected as incredible Patel's assertion that the cash found in his home had accumulated from various family businesses. Finally, the court emphasized that a money counter had also been recovered during the search and that such an implement frequently is used by narcotics traffickers. In challenging this aspect of the court's forfeiture order, Patel contends that the government's evidence is insufficient to sustain the forfeiture of the cash.[2]

It is by now well settled that criminal forfeiture under section 853(a) is considered an element of the defendant's sentence, rather than an element of the underlying crime. *Libretti v. United States*, 516 U.S. 29, —, 116 S.Ct. 356, 364, 133 L.Ed.2d 271 (1995); *United States v. Ben–Hur*, 20 F.3d 313, 317 (7th Cir.1994). As such, the government need only establish its right to forfeiture by a preponderance of the evidence, the standard applicable at sentencing, rather than by proof beyond a reasonable doubt. *United States v. Messino*, 122 F.3d 427, 428 (7th Cir.1997); *Ben–Hur*, 20 F.3d at 317; *United States v. Simone*, 931 F.2d 1186, 1199 (7th Cir.), *cert. denied*, 502 U.S. 981, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991). The evidence outlined above satisfies the government's

---

**2.** The district court also ordered the forfeiture of the Nissan Quest minivan that Patel had been driving at the time of his arrest (*see* 21 U.S.C. § 853(a)(2)), and that aspect of the forfeiture order is not challenged here.

burden. As the district court noted, Patel's own tape-recorded statements established the extent and lucrative nature of his cocaine dealing. Once the district court rejected Patel's evidence that the money found in his home was derived from legitimate family businesses, it was reasonable for the court to conclude that the money came from Patel's cocaine dealing. *See United States v. Wojcik,* 60 F.3d 431, 434 (8th Cir.1995). We thus conclude that the court's forfeiture order is supported by a preponderance of the evidence.

### B.

█ Before addressing the adequacy of the district court's findings at sentencing, we must consider the government's contention that Patel waived that argument by failing to object after the district court made its findings at the sentencing hearing. Although Patel filed written objections to the PSR and asserted throughout the three-day hearing that he should be held responsible for less than fifty kilograms of cocaine, that he did not qualify as a manager or supervisor under U.S.S.G. § 3B1.1(b), and that he was entitled to a two-level reduction for acceptance of responsibility, the government contends that Patel waived any challenge to the sufficiency of the court's findings when he failed to object again after the district court had resolved the disputed issues. Although we think it may have been prudent for Patel to have raised an objection at that point, we find that in the circumstances of this case, the sentencing issues were properly preserved.

Many of the cases cited by the government in support of its waiver argument involve a defendant's failure to raise an objection once the district court has chosen a particular sentence within the guidelines range without articulating the reasons underlying its choice. Although 18 U.S.C. § 3553(c) requires the sentencing judge to state in open court her reasons for imposing a particular sentence within the range, we have refused to remand for resentencing when the judge neglects to provide reasons but the defendant raises no objection at the time. See *United States v. Caicedo,* 937 F.2d 1227, 1236 (7th Cir.1991);

*see also United States v. Burns,* 128 F.3d 553, 556 (7th Cir.1997); *United States v. Mojica,* 984 F.2d 1426, 1444 (7th Cir.), cert. denied, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). Similarly, we have held that a defendant also waives any objection to the sufficiency of the district court's findings on disputed sentencing issues when the court specifically elicits objections to its findings at the hearing and the defendant raises none. *United States v. Strauser,* 21 F.3d 194, 197 (7th Cir.1994); *cf. United States v. Page,* 69 F.3d 482, 492–93 (11th Cir.1995) (district court erred under Eleventh Circuit precedent by failing to elicit objections to its factual findings). But contrary to the government's representations in its brief and at oral argument (*see* Govt. Br. at 29), the district judge did not specifically elicit objections to the sufficiency of its findings here. The judge merely made findings on the disputed issues and then asked for the parties' positions on where Patel should be sentenced within the applicable range. We thus are faced with a situation in which the defendant consistently disputed certain issues under the Guidelines only to have the judge resolve those issues against him after a lengthy sentencing hearing. Although Patel may have been well-advised to object again if he viewed the court's findings as inadequate (*see United States v. Salinas,* 62 F.3d 855, 859, 860 (7th Cir.1995); *United States v. Zarnes,* 33 F.3d 1454, 1475 (7th Cir.1994), cert. denied, 515 U.S. 1126, 115 S.Ct. 2286, 132 L.Ed.2d 288 (1995)), we do not think Patel waived his right to challenge those findings here when he failed to make that further objection below. *See United States v. Goines,* 988 F.2d 750, 777 (7th Cir.) (vacating sentences and remanding for proper findings where defendants apparently raised no objection to the court's findings but disputed the PSR's drug quantity determinations throughout a lengthy sentencing hearing), cert. denied, 510 U.S. 887, 982, 995, 114 S.Ct. 241, 483, 558, 126 L.Ed.2d 195, 433, 458 (1993); *see also United States v. Bauer,* 19 F.3d 409, 413 (8th Cir.1994) (although the defendant should have specifically objected to the lack of findings to support the imposition of a fine under U.S.S.G. § 5E1.2, he adequately preserved the issue by objecting to the relevant portion

of the PSR and by contesting the PSR's conclusions at his sentencing hearing). We find that the arguments raised here were properly preserved, and we therefore proceed to consider them.

### 1.

■ Patel first argues that the lower court's findings are insufficient to support a three-level enhancement under section 3B1.1(b). That enhancement is appropriate "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). In applying the enhancement here, the district court explained only that Patel clearly was "a manager in the cocaine business." (Sept. 5, 1996 Tr. at 429.) Patel argues that such a finding is insufficient because it fails to identify at least one participant who he supervised or managed, and because it makes no mention of the requirement that there be five or more participants or criminal activity that could be characterized as "otherwise extensive." The government responds that the evidence presented at the sentencing hearing was more than adequate to support the three-level enhancement. In that regard, the government identifies various participants who allegedly were controlled by Patel, as well as the "five or more participants" allegedly involved in the criminal activity.

■ The issue here, however, is not whether the government or this panel could identify evidence in the record to support the enhancement, but whether the district court, in choosing to apply it, made the findings necessary to support its decision. As we said, the district judge overruled Patel's objection to the enhancement by finding only that Patel "clearly [was] a manager in the cocaine business." (Sept. 5, 1996 Tr. at 429.) The judge made no further findings to support that conclusion, nor did he reference the recommendations in the PSR. For example, the district court did not identify any other participant in the criminal activity who was controlled by Patel, although the commentary to section 3B1.1(b) explains that the defendant must have exercised control over

at least one other participant for the enhancement to apply. U.S.S.G. § 3B1.1, comment. (n.2) (1995); *United States v. Fones*, 51 F.3d 663, 668 (7th Cir.1995); *see also United States v. Jewel*, 947 F.2d 224, 235–36 (7th Cir.1991) (remanding where district court failed to identify the other participants that each defendant had supervised). The Guideline also requires that the relevant criminal activity involve "five or more participants" or be "otherwise extensive," yet the district judge did not determine whether either or both prongs were applicable here. The PSR suggests that Patel's criminal activity was otherwise extensive "because of the amount of cocaine and money that was involved" (PSR at 13), but again, the district judge did not reference that recommendation in addressing Patel's objection. On appeal, the government argues that the criminal activity also involved five or more participants, but as we said, the PSR focused only on the otherwise extensive prong, and the government did not suggest below that the five or more participants requirement also was met. In any event, after the district court rejected Patel's suggestion that he merely played a minimal role in the offense, the court was silent on the issue of whether Patel's criminal activity involved five or more participants or was otherwise extensive. That is an essential finding for the application of a three-level enhancement under section 3B1.1(b), and as we have indicated before, it is a finding for the district court, and not this court, to make. *See United States v. Austin*, 54 F.3d 394, 405 (7th Cir.1995) (refusing to affirm on "otherwise extensive" prong where the exclusive focus at sentencing was the "five or more participants" prong); *United States v. Tai*, 41 F.3d 1170, 1175 (7th Cir.1994) ("this Court [will] not sift through the record to make the factual findings necessary to support the district court's determination."); *United States v. Tai*, 994 F.2d 1204, 1212 (7th Cir.1993) ("it is not this court's role to make the factual findings necessary to support a sentencing calculation; that is a task for the district court."); *United States v. Schweihs*, 971 F.2d 1302, 1318 (7th Cir.1992).

In sum, when an issue under the Guidelines is disputed, as the application of section 3B1.1(b) was here, the district judge either

must adopt the PSR's recommended findings or make independent findings sufficient to support its conclusion. Because the court's comments at sentencing suggest that it did neither with respect to the manager or supervisor enhancement, we must vacate Patel's sentence and remand for appropriate findings and the imposition of a new sentence.

### 2.

Patel also contends that the district court's factual findings are insufficient to support its conclusion that his base offense level under U.S.S.G. § 2D1.1(a)(3) be calculated on the basis of between 50 and 150 kilograms of cocaine. Having first included the forty kilograms involved in the April 5 transaction and the five kilograms Patel admitted to selling Bruno on January 25, the court referenced its earlier findings on the government's forfeiture count—in particular, that the $2 million recovered by the authorities during the two traffic stops belonged to Patel and represented the proceeds of drug trafficking. The court concluded that based on its earlier findings, it would sentence Patel on the basis of more than 50 but less than 150 kilograms of cocaine.[3] Patel's challenge to that determination relates primarily to the question of whether the district court's drug quantity findings are sufficient to establish that any cocaine beyond the forty-five kilograms constitutes "relevant conduct" under U.S.S.G. § 1B1.3(a). In particular, Patel argues that although the additional kilograms appear to have been derived from the $2 million recovered during the traffic stops, the district court made no findings with respect to the alleged drug transactions that produced those proceeds. Thus, Patel argues, there was no finding that the alleged transactions represented by the $2 million were "part of the same course of conduct or common scheme or plan as the offense of conviction." See U.S.S.G. § 1B1.3(a)(2).

First, we have no difficulty with the district court's finding that the approximately $2 million in cash recovered by police during

the December 14, 1994 and February 16, 1995 traffic stops represented the proceeds of drug trafficking. Patel told Bruno as much during one of their recorded conversations, and the district court was entitled to reject the explanation for that statement offered by Patel—that he merely was "puffing" in order to impress Bruno. Under our cases, moreover, it is acceptable for a district judge to estimate drug quantity by converting proceeds into a corresponding amount of the drug at issue, so long as the conversion is based on reliable evidence of the drug's price at the relevant time. See United States v. Henderson, 58 F.3d 1145, 1153 (7th Cir. 1995); United States v. Rivera, 6 F.3d 431, 446 (7th Cir.1993), cert. denied, 510 U.S. 1130, 114 S.Ct. 1098, 127 L.Ed.2d 411 (1994); see also United States v. Howard, 80 F.3d 1194, 1204 (7th Cir.1996). Although Patel quibbles with the conversion price utilized in the PSR, the possible alternative prices disclosed by the record would not take Patel outside the 50 to 150 kilogram range.

Patel's more substantial argument on this issue relates to the lack of any finding that the drug transactions deemed to be relevant conduct "were part of the same course of conduct or common scheme or plan" as the April 5 transaction for which Patel was convicted. See U.S.S.G. § 1B1.3(a)(2). Our cases require that when a district judge sets a defendant's base offense level by aggregating drug quantities from uncharged or unconvicted conduct, the judge must " 'explicitly state and support, either at the sentencing hearing or (preferably) in a written statement of reasons, its finding that the unconvicted activities bore the necessary relation to the convicted offense.' " United States v. Acosta, 85 F.3d 275, 280 (7th Cir.1996) (quoting United States v. Duarte, 950 F.2d 1255, 1263 (7th Cir.1991), cert. denied, 506 U.S. 859, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992)); see also United States v. Townsend, 73 F.3d 747, 752 (7th Cir.1996). That is because a defendant is not automatically responsible under the relevant conduct guideline for all drug trans-

---

**3.** The PSR recommended that Patel be held accountable for 145 kilograms. It indicated that the $2 million in drug proceeds was the equiva-lent of 100 kilograms of cocaine. (PSR at 12–13.)

actions revealed by the record, but only for those that are "part either of the same course of conduct as the charged offense or of a common scheme or plan including the charged offense." *United States v. Crockett*, 82 F.3d 722, 730 (7th Cir.1996). In that regard, we have consistently cautioned that section 1B1.3(a)(2) must not be read to encompass any offense that is similar in kind to the offense of conviction but that does not bear the required relationship to that offense. *E.g., Crockett*, 82 F.3d at 729; *United States v. Beler*, 20 F.3d 1428, 1432 (7th Cir. 1994); *United States v. White*, 888 F.2d 490, 500 (7th Cir.1989).

Despite our insistence on an explicit finding, however, we have been willing to affirm where the record reveals that the district court relied on the recommendations of the PSR and carefully considered the government's theory on the relationship between the offense of conviction and the additional conduct. *See Acosta*, 85 F.3d at 280; *United States v. Taylor*, 72 F.3d 533, 548 (7th Cir. 1995); *United States v. Thomas*, 969 F.2d 352, 355 (7th Cir.), *cert. denied*, 506 U.S. 896, 113 S.Ct. 274, 121 L.Ed.2d 202 (1992). In other words, where it is clear that the district judge believed the required relationship to be present and the judge's implicit finding is supported by the record, we have been reluctant to remand simply because the judge failed to invoke the "magic words" of section 1B1.3(a)(2). *See Acosta*, 85 F.3d at 280; *Taylor*, 72 F.3d at 548.

The government tells us that this is such a case because the evidence in the record clearly shows that the transactions represented by the $2 million in proceeds were part of the same course of conduct as the April 5 cocaine sale to Bruno that culminated in Patel's arrest. "Offenses are part of the same course of conduct if they are 'sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses,'" and the factors relevant to that determination include "'the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses.'" *Taylor*, 72 F.3d at 548 (quoting U.S.S.G. § 1B1.3, comment

(n.9(B))). In this case, the information about the alleged additional transactions that produced the $2 million in proceeds is somewhat sketchy. We know only that the money was recovered during traffic stops on December 14, 1994 and February 16, 1995, that the driver of one of the vehicles was Patel's cousin while the driver of the other was Miller (the individual who had delivered the cocaine to Bruno on January 25), and that Patel was required to make up the $2 million that had been lost to his supplier. The district court made no findings addressed to the relationship between the transactions that produced the $2 million in proceeds and the conspiracy to distribute cocaine to Bruno on April 5. The government insists that the proceeds recovered during the two traffic stops were but a small part of the proceeds generated by Patel's ongoing cocaine distribution network in the Chicago metropolitan area, and that all of these activities were part of a single course of conduct under section 1B1.3(a)(2). It is possible that that is what the district judge had in mind when he referenced his earlier finding that Patel had been engaged in "large-scale drug transactions." Yet the fact of Patel's participation in other drug transactions does not itself establish the required relationship between those earlier transactions and the offense of conviction, which is the central issue under section 1B1.3(a)(2). Because we already are remanding on the manager/supervisor issue, we also will request the district judge on remand to revisit the question of relevant conduct. If the court determines to again sentence Patel on the basis of the cocaine represented by the approximately $2 million in drug proceeds, it should explicitly address the relationship between that cocaine and the offense for which Patel was convicted.

### 3.

■ Which brings us to Patel's final objection to the district court's sentencing determinations—that the court erred in denying him a two-level reduction under section 3E1.1 for acceptance of responsibility. In denying that reduction, the court explained that Patel had "denied relevant conduct, which is clearly implied by my earlier findings with respect to his extensive activity in

the drug business." (Sept. 5, 1996 Tr. at 430.) Patel's argument on appeal is that the district court made an error of law because it required him to affirmatively admit relevant conduct, whereas the commentary to section 3E1.1 indicates that in order to obtain the reduction, "a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction." U.S.S.G. § 3E1.1, comment. (n.1(a)). Although certain of his comments at sentencing could be read as suggesting that the district judge was requiring Patel to volunteer information about his unconvicted conduct, it is clear that the judge also found Patel to have denied relevant conduct that the court determined to be true. That is clearly an appropriate basis for the denial of the two-level reduction. *See id.* ("a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility."); *United States v. Akindele,* 84 F.3d 948, 957 (7th Cir.1996).

We assume along with the government that when the district court observed that Patel had denied relevant conduct, the court was referring to its earlier determination that the $2 million from the traffic stops belonged to Patel and represented the proceeds of drug trafficking. That was the aspect of Patel's "relevant conduct" on which the PSR focused in recommending that the reduction for acceptance of responsibility be denied. (PSR at 12.) Yet as we just explained, the district court's findings at sentencing are insufficient to support the conclusion that any cocaine transactions producing those proceeds qualify as "relevant conduct" under the Guidelines. In the absence of a sufficient relevant conduct determination, we are unable to affirm the denial of a reduction for acceptance of responsibility on the ground that Patel falsely denied relevant conduct. As a result, the district court must also revisit this issue on remand.

### III.

For the foregoing reasons, we affirm the district court's forfeiture order but vacate Patel's sentence and remand for resentencing.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.