[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
01/28/2000
THOMAS K. KAHN
CLERK

No. 98-3455

D. C. Docket No. 94-00182-CR-T-23A

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

VERNESS R. KENNEDY,
PINELLAS COUNTY TEACHERS CREDIT UNION,

Interested Parties-Appellees,

CONTINENTAL GRAPHICS CORPORATION,

Interested Parties-Appellants.

Appeals from the United States District Court
for the Middle District of Florida

**(January 28, 2000)**

Before TJOFLAT and CARNES, Circuit Judges, and GARWOOD*, Senior Circuit
Judge.

_____
*Honorable Will L. Garwood, Senior U.S. Circuit Judge for the Fifth Circuit, sitting
by designation.

TJOFLAT, Circuit Judge:

The ultimate question in this case is whether a state divorce court can defease the United States of its interest in property forfeited under the criminal forfeiture provisions of 18 U.S.C. § 982 (1994) and 21 U.S.C. § 853 (1994). We answer this question in the negative.

I.

A.

On January 27, 1995, a federal grand jury in the Middle District of Florida indicted Byron Kennedy ("Kennedy") on twelve counts of mail fraud in violation of 18 U.S.C. § 1341 (1994),[1] and two counts of unlawful monetary transactions in

---

[1] 18 U.S.C. § 1341 provides, in pertinent part:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

violation of 18 U.S.C. § 1957 (1994).[2]  The indictment included a forfeiture count

---

[2] 18 U.S.C. § 1957 provides, in pertinent part:

(a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

(b)(1) Except as provided in paragraph (2), the punishment for an offense under this section is a fine under title 18, United States Code, or imprisonment for not more than ten years or both.

(2) The court may impose an alternate fine to that imposable under paragraph (1) of not more than twice the amount of the criminally derived property involved in the transaction.

. . . .

(d) The circumstances referred to in subsection (a) are –

(1) that the offense under this section takes place in the United States . . . .

. . . .

(f) As used in this section –

(1) the term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of this title) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title

. . . .

(2) the term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense; and

(3) the term "specified unlawful activity" has the meaning given that term in section 1956 of this title.

Section 1956(c)(7)(A) defines "specified unlawful activity" as "any act or activity constituting an offense listed in section 1961(1) of [title 18] except an act which is indictable under subchapter II of chapter 53 of title 31."  A violation of section 1341 (relating to mail fraud) is listed as an offense in section 1961(1).

3

which alleged that Kennedy's interest, to the extent of $177,445.05, in a beach house located at 2910 Sunset Way, St. Petersburg Beach, Florida, was forfeitable to the United States pursuant to 18 U.S.C. § 982 because it was acquired with proceeds of criminal activity.[3]

Continental Graphics, Inc. ("CGI")[4] was engaged in the business of selling yearbooks to high school students, and Kennedy was its sales representative for several Florida schools. The indictment alleged that between April 1984 and December 1990, Kennedy engaged in a scheme to defraud CGI of over $800,000 by stealing monies paid by students (to their schools) for yearbooks. The scheme was not complicated. On April 4, 1984, Kennedy convinced CGI to cease billing the schools directly, and instead to allow him (through his company, Byron Kennedy & Co.) to bill them. Kennedy told CGI that he would instruct the schools to mail their payments to a post office box in St. Petersburg, Florida, which would be under the control of the

---

[3] 18 U.S.C. § 982(a)(1) provides, in pertinent part:
The court, in imposing sentence on a person convicted of an offense in violation of section . . . 1957 . . . of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.
Section 982(b)(1) provides that "[t]he forfeiture of property under this section . . . shall be governed by . . . [21 U.S.C. § 853]." We discuss section 853, which is at the heart of this appeal, in part III.

[4] CGI was originally named Delmar Printing Company, Inc.; the indictment reads accordingly.

Bank of Florida. The bank was to act as an agent of CGI, and to deposit in a CGI account all the monies received. All remittances to the account were to be the sole property of CGI, and Kennedy would not have the right to withdraw or receive any of the account funds, or to collect any of the payments directly from the schools. The April 4 agreement provided that Kennedy would instruct the schools to send their payments to Post Office Box 10933.

Kennedy altered the invoices, however, so as to instruct schools to send their payments to P.O. Box 10937. Only Kennedy had access to Box 10937. When CGI became concerned that the new arrangement had led to an alarming rate of past due invoices, Kennedy told the company that he had no idea why payments were not being received. In the meantime, Kennedy was pocketing thousands of dollars that schools had mistakenly sent to his personal post office box, in violation of 18 U.S.C. § 1341. The indictment also alleged that Kennedy had converted $177,445.05 of the stolen money by purchasing a beach house at 2910 Sunset Way in St. Petersburg, in violation of 18 U.S.C. § 1957. On the same day the indictment was returned, the Government recorded its notice of lis pendens on the property.

On July 28, a jury found Kennedy guilty on all counts and also returned a special verdict finding that the Sunset Way property "was involved in the unlawful monetary transaction [prohibited by 18 U.S.C. § 1957] . . . , or is property traceable

5

to property which was involved in the unlawful monetary transaction . . . ." On November 30, the district court issued an order forfeiting all Kennedy's right, title, and interest in the Sunset Way property to the United States, pursuant to 18 U.S.C. § 982.[5] The court also sentenced Kennedy to fifty-seven months imprisonment, three years of supervised release, and ordered restitution in the amount of $832,011 to be paid to CGI.

B.

---

[5] The court styled its order a "Preliminary Order of Forfeiture," but we treat it as a final order because courts are not at liberty to enter preliminary forfeiture orders at the sentencing phase of a criminal proceeding. Under Federal Rule of Criminal Procedure 32(d)(2), "[i]f a verdict contains a finding that property is subject to a criminal forfeiture . . . the court may enter a preliminary order of forfeiture after providing notice to the defendant and a reasonable opportunity to be heard on the timing and form of the order." Preliminary forfeiture orders, however, are primarily used to enable the Government to marshal the defendant's assets subject to forfeiture.

> The [preliminary] order of forfeiture shall authorize the Attorney General to seize the property subject to forfeiture, to conduct any discovery that the court considers proper to help identify, locate, or dispose of the property, and to begin proceedings consistent with any statutory requirements pertaining to ancillary hearings and the rights of third parties.

Fed. R. Crim. P. 32(d)(2). The rule makes clear that "[a]t sentencing, a final order of forfeiture shall be made part of the sentence and included in the judgment." Id. Because the district court entered its order at the time it sentenced Kennedy, the order was properly a final order of forfeiture.

6

After the court entered its order of forfeiture, three parties filed petitions in the district court seeking to adjudicate their interests in the Sunset Way property in accordance with 21 U.S.C. § 853(n)(2):[6] (1) CGI; (2) Verness Kennedy ("Mrs. Kennedy"), Kennedy's former spouse; and (3) the Pinellas County Teachers Credit Union (the "Credit Union"), which held a mortgage on the Sunset Way property. The district court assigned the case to a magistrate judge who held a hearing and made appropriate findings of fact. Following, we summarize the findings of fact adopted by the district court pertaining to the interests of CGI, Mrs. Kennedy, and the Credit Union.

In June 1989, the Kennedys entered into a real estate contract to purchase the Sunset Way beach house for $542,500. By then they had been married for almost

_____

[6] As noted, supra, section 982(b)(1) provides that forfeiture of property under that section is governed by the criminal forfeiture provisions of 21 U.S.C. § 853. Under section 853(k), third parties are barred from attempting to establish their interest in property subject to forfeiture until a final order of forfeiture has been entered. They may not intervene in the criminal action against the defendant in which the Government establishes its right to forfeiture, nor may they initiate a civil action to adjudicate the validity of their interest once an indictment or information has been filed. See 21 U.S.C. § 853(k). Section 853(n)(2) provides that following the entry of an order of forfeiture,

> [a]ny person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United states pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice . . . , whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property.

7

thirty-one years. Their four sons were grown. Mrs. Kennedy considered their old house too large and costly to upkeep, and she no longer liked their old neighborhood. To her, the beach house she had spotted for sale offered more. Her husband, however, did not share her enthusiasm. Because of his reluctance and her desire for change, Mrs. Kennedy committed much of her personal wealth to convince him to join her in purchasing the residence.

Mrs. Kennedy had worked throughout most of the marriage. She taught in the public school system, modeled, refinished furniture, and owned (and continues to own) Patti and Friends Antique Mall, a business that rents booths to about eighty vendors. She had inherited securities after her mother's death in 1968, and knew by June 1989 that she could expect to receive a significant inheritance due to her father's recent death. Consequently, Mrs. Kennedy thought she would have the financial means to contribute toward the purchase of the new home.

Unfortunately, at the time she wanted to execute a contract on the Sunset Way property, Mrs. Kennedy did not have the means in hand. Her inheritance had not come through, and the Kennedys had not yet sold their old residence. Therefore, in June 1989, Mrs. Kennedy promised to repay her husband if he would make the $50,000 earnest money deposit. Kennedy agreed, telling his wife that he would borrow the money from his business.

8

The couple acquired the property in September 1989. At the closing, they paid the sellers $134,445.05 in cash and assumed an existing $356,000 mortgage held by the Credit Union. As with the earnest money deposit, Kennedy advanced the cash payment (again telling his wife that he was borrowing the money from his business) with the understanding that Mrs. Kennedy would repay him either when she received her inheritance or when their old house sold. Though Mrs. Kennedy was unaware of her husband's improprieties, it is undisputed that the $184,445.05.[7] contributed by Kennedy toward the purchase of the beach house was money stolen from CGI.

The district court found that when the Kennedys closed on the beach house in September 1989, they owned the property as tenants by the entireties, meaning that each spouse had "an indivisible right to own and occupy the entire property." United States v. One Single Family Residence With Out Bldgs., 894 F.2d 1511, 1515 (11th Cir. 1990). Despite their joint ownership, Mrs. Kennedy kept her promise to repay her husband almost the full amount of the funds that he had contributed toward the purchase of the residence. After her inheritance came through, and the couple's old house sold, Mrs. Kennedy wrote her husband three checks totaling $180,000.[8]

---

[7] The $184,445.05 figure comprises the sum of the $50,000 earnest money deposit and the $134,445.05 cash payment made to the sellers at closing.

[8] The dates of the three checks written by Mrs. Kennedy to her husband were December 17, 1989 ($100,000), February 15, 1991 ($40,000), and March 7, 1991

Mrs. Kennedy first learned of her husband's fraud in May 1991. As noted above, Kennedy was indicted on charges of mail fraud and unlawful monetary transactions a little less than four years later, on January 27, 1995; this was the same day that the Government recorded its notice of lis pendens on the Sunset Way residence. Two months later, Mrs. Kennedy filed for a divorce. At a domestic mediation conference held to establish the financial terms of the divorce, the parties agreed that Mrs. Kennedy had a "special equity" in the beach house; this was largely because, including the funds Mrs. Kennedy had used to repay her husband for his contributions at the time of purchase, Mrs. Kennedy produced checks totaling more than $392,412 that she had invested in the property.[9] Accordingly, Kennedy agreed to transfer any rights he possessed in the property to her. On September 19, 1995, the state court entered a divorce decree which adopted the mediation agreement, awarded the Sunset Way property to Mrs. Kennedy because of her agreed upon special equity in the residence, and dissolved the marriage.[10] More than a month later on November

($40,000). Her last check to her husband was actually written for $119,000, but it included his share of the proceeds from the sale of their former residence ($79,000).

[9] In addition to repaying her husband, the district court found that Mrs. Kennedy made 87% of the mortgage payments, paid the taxes on the property, and took care of most of the maintenance costs.

[10] Through an oversight, the final divorce decree entered on September 19, 1995 did not address the disposition of the Sunset Way property. The Kennedys brought

30, 1995, the United States District Court for the Middle District of Florida entered its order forfeiting to the United States all Kennedy's right, title, and interest in the Sunset Way property.

## C.

Under 21 U.S.C. § 853(n)(6), third party petitioners can establish their interest in forfeited property in only two ways. See United States v. Reckmeyer, 836 F.2d 200, 203 (4th Cir. 1987) ("Subsection (n) provides the only means for third parties to establish their interest in forfeited property."). The statute provides:

> If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that–
>
> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or
> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

this omission to the attention of the divorce court which, on January 2, 1996, corrected its error; the court entered an order, awarding Mrs. Kennedy a special equity in the house, nunc pro tunc to September 19, 1995. In its findings, the district court characterized the divorce court's omission as "scrivener's error."

11

the court shall amend the order of forfeiture in accordance with its determination.

21 U.S.C. § 853(n)(6).

> Thus subsection (n)(6) protects only two classes of petitioners, those whose legal interests in the property were superior to the defendant[] at the time the interest of the United States vested through the commission of an act giving rise to forfeiture and "bona fide purchasers for value" without knowledge of the forfeitability of the defendant's assets.

Reckmeyer, 836 F.2d at 204; see also United States v. Jimerson, 5 F.3d 1453, 1455 (11th Cir. 1993).

The district court concluded that Mrs. Kennedy prevails under either section. The court found that

> Mrs. Kennedy is a bona fide purchaser for value and that she has a legal interest in the Sunset Way property resulting in a superior right to the defendant's former interest in the property pursuant to 21 U.S.C. §§ 853(n)(6)(A) & (B). Therefore, under the applicable law, forfeiture of [ Kennedy's interest in] the residence is inappropriate.

The court thus modified its November 30, 1995 order of forfeiture, and granted both Mrs. Kennedy's and the Credit Union's petitions to establish their interests in the forfeited property, with the Credit Union having priority as a mortgagee. The court also denied CGI's petition to establish its interest in the forfeited property. The Government and CGI now appeal. All parties agree that the government's interest, if any, is limited to Kennedy's one-half interest in the property. Mrs. Kennedy's one-

12

half interest was never subject to forfeiture, and it remains unaffected by our decision today.

## II.

We review the district court's findings of fact for clear error. We independently review the court's conclusions of law de novo. See One Single Family Residence, 894 F.2d at 1513. Though CGI challenges some of the district court's factual findings, our review of the record convinces us at the outset that the court's findings of fact are not clearly erroneous. Our review is therefore limited to questions of law.

## III.

The criminal forfeiture provisions of section 853 authorize the government to seek forfeiture of a defendant's interest in subject property. See United States v. Lester, 85 F.3d 1409, 1413 (9th Cir. 1996). This is in contrast to the civil forfeiture scheme embodied in 21 U.S.C. § 881, involving an in rem proceeding, wherein the whole property (as opposed to a particular defendant's interest in the property) is treated as being itself guilty of wrongdoing. See United States v. One 1976 Mercedes Benz 280S, 618 F.2d 453, 454 (7th Cir. 1980). Thus, we must decide whether

Kennedy's interest in the Sunset Way property is properly forfeitable to the United States, or whether Mrs. Kennedy has established either (a) that she is a bona fide purchaser for value of Kennedy's interest in the real estate, or (b) that she had an interest in the property that was superior to Kennedy's interest at the time he committed the acts giving rise to the forfeiture.

## A.

The district court concluded that Mrs. Kennedy became a bona fide purchaser for value as of the date that she and her husband closed on the Sunset Way property. The court found,

> Mrs. Kennedy, along with her husband, purchased the Sunset Way residence from the sellers on September 1, 1989. She was unaware that the money her husband used toward the down payments was criminally obtained. Thus, pursuant to § 853(n)(6)(B), Mrs. Kennedy purchased the residence as a "bona fide purchaser for value" who was both "reasonable" and "without cause to believe that the property was subject to forfeiture" at the time of purchase.

This analysis does not address the real question, which is, did Mrs. Kennedy ever purchase her former husband's interest in the subject property. Of course Mrs. Kennedy became a "bona fide purchaser for value" of some part of the Sunset Way property on September 1, 1989, because along with her then-husband she assumed a $356,000 mortgage on the property. Specifically, she purchased a spousal interest in

14

a tenancy by the entireties under Florida law, "an indivisible right to own and occupy the entire property." One Single Family Residence, 894 F.2d at 1515.[11] But this bona fide purchase for value is irrelevant under section 853(n)(6)(B). The statute asks whether a third party petitioner ever became a bona fide purchaser for value of the defendant's interest in the subject property. Finding that Mrs. Kennedy is a bona fide purchaser for value of her own interest in the tenancy by the entireties is not relevant. The question is, did she ever purchase Kennedy's interest in the property.

Once the question is properly framed, it becomes clear that Mrs. Kennedy cannot prevail under the bona fide purchaser exception. Mrs. Kennedy argues that she did indeed purchase Kennedy's interest in the property because she repaid the funds Kennedy contributed as an earnest money deposit and at closing with her separate inheritance money. She characterizes Kennedy's initial contributions as a loan, whereby neither she nor her former husband ever intended that any part of the Sunset Way property be owned by him; and she reminds the court that it was she, and not Kennedy, who wanted to buy the beach residence in the first place, and that Kennedy

---

[11] In One Single Family Residence, 849 F.2d at 1514, this court explained, [t]o hold property by the entireties, Florida common law requires five 'unites' to be present: marriage–the joint owners must be married to each other; title–the owners must both have title to the property; time–they both must have received title from the same conveyance; interest–they must have an equal interest in the whole of the property; and control or possession–they both must have the right to use the entire property.

15

would never have consented to the purchase while they were married had she not promised to repay him all the monies he initially invested. But this argument is belied by the plain fact that the couple took title to the property jointly, as tenants by the entireties. A tenancy by the entireties is an ownership arrangement peculiar to marriage, the most significant aspect of which is its distribution of property between two people who form, in the eyes of the law, a unity. Under the Florida law,

> [a]s long as all the unities remain intact . . . each spouse's interest comprises the whole or entirety of the property and not a divisible part; the estate is inseverable. Neither spouse can sell, forfeit or encumber any part of the estate without the consent of the other, nor can one spouse alone lease it or contract for its disposition. Creditors cannot levy on entireties property to satisfy the debt of an individual spouse. The state cannot deem entireties property forfeit because of the unlawful conduct of one spouse acting alone.

One Single Family Residence, 894 F.2d at 1514-15 (internal citations and quotation marks omitted). To argue that both spouses always intended Mrs. Kennedy to be the sole owner of the property seems strained at best, given that she and Kennedy entered into a form of ownership most notable for its joint encumberments.[12] The argument

---

[12] The couple might have assumed joint ownership of the property as a way of giving Kennedy collateral for his "loan" to Mrs. Kennedy for the earnest money deposit and the cash payment made at closing. If this were the case, however, one would expect that Kennedy would have transferred all his interest in the property by quitclaim deed sometime immediately after March 7, 1991, when Mrs. Kennedy paid him the last of the $180,000 that was owed him. But Kennedy did not execute a quitclaim deed on the property in favor of Mrs. Kennedy until the two were divorced in 1995. Until that time, they continued to own the beach residence as tenants by the

16

is also undermined by Mrs. Kennedy's own testimony during the third party ancillary proceeding in which she told the court that it was her understanding that she and Kennedy both owned the Sunset Way residence during the marriage. There is simply no evidence that Mrs. Kennedy ever became a bona fide purchaser for value of Kennedy's interest in the beach house through a genuine arms-length transaction, and therefore Mrs. Kennedy cannot prevail under section 853(n)(6)(B).

B.

i.

The district court also found that Mrs. Kennedy could escape forfeiture of her former husband's interest in the property under the superior title provisions of section 853(n)(6)(A). The court reasoned that because the divorce court had granted Mrs. Kennedy a special equity in the home upon dissolution of the marriage, and directed Kennedy to transfer to her all his right, title, and interest in the home, Mrs. Kennedy had an interest in the whole property that was superior to his. Florida law does recognize a special equity upon divorce when one spouse can demonstrate that (1) he or she paid for certain property from a source unconnected with the marriage, and (2) a gift to the other spouse was not intended. See Robertson v. Robertson, 593 So.2d

entireties.

17

491, 494 (Fla. 1991).  The special equity "only comes into actual identifiable form," however, "upon the termination of the marriage status."  Bosch v. United States, 590 F.2d 165, 167 (5th Cir. 1979).[13]  The former fifth circuit held, in Bosch, that the equity actually "exist[s] prior to the divorce."  Id.  The award upon dissolution of the marriage is merely a judicial recognition of an already-existing interest that came into being when the spouse holding the equity made a significant nonmarital investment in the property.  There is no question, however, that the earliest point at which the interest can vest is "at a point in time when [the spouse] makes a contribution of funds, property, or services toward acquisition or betterment of property from a source unconnected with the marriage."  Starcher v. Starcher, 391 So.2d 340, 341 (Fla. 4th DCA 1980).  The earliest point at which Mrs. Kennedy's special equity could have vested was December 1989, when she first began using her inheritance money to pay back her husband for his initial contributions.

Section 853(n)(6)(A) requires a third party petitioner to establish that he or she had an interest in the subject property that "was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this

_____

[13]  In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down on or before September 30, 1981.

18

section." 21 U.S.C. § 853(n)(6)(A) (emphasis added). The acts which gave rise to the forfeiture took place in June 1989, when Kennedy used $50,000 of money stolen from CGI as an earnest money deposit for the property, and September 1989, when Kennedy used $134,445.05 in stolen funds as a cash payment at closing. This was months before the earliest time at which Mrs. Kennedy's special equity could have vested. At the time of the acts giving rise to the forfeiture, Mr. and Mrs. Kennedy took title to the property as tenants by the entireties. The state court's grant of a special equity, even with its recognition of an interest in Mrs. Kennedy that was vested prior to dissolution, does not alter that conclusion. Because we have explicitly held in Jimerson, 5 F.3d at 1455, that "[t]he very nature of the tenancy by the entireties prevents [a petitioner] from claiming that her title is superior to her husband's," we conclude that Mrs. Kennedy cannot prevail under section 853(n)(6)(A) because even if she had an interest that was superior to her former husband's, no such interest was vested at the time of the act giving rise to the forfeiture.

ii.

Mrs. Kennedy contends that the Sixth Circuit's decision in United States v. Certain Real Property Located at 2525 Leroy Lane (Leroy Lane II), 972 F.2d 136 (6th

Cir. 1992), is both on point and persuasive. We agree that the decision is on point; after consideration, however, we cannot agree that it is persuasive. In Leroy Lane II, the government sought both civil and criminal forfeiture of the defendant's residence, held prior to divorce by him and his wife as tenants by the entireties. Upon dissolution of the marriage, the divorce court awarded the whole property to the wife "free and clear of any and all claims or interest of the Defendant." Id. at 137. Citing this court's decision in One Single Family Residence, the Sixth Circuit concluded in United States v. Certain Real Property Located at 2525 Leroy Lane (Leroy Lane I), 910 F.2d 343, 351-52 (6th Cir. 1990), that the government could not execute on a defendant's interest in a tenancy by the entireties while the interest was still intact, even if such interest was subject to forfeiture. To do so would burden the interests of "innocent owners" in the civil forfeiture context, see 21 U.S.C. § 881(a)(7) (1994), and of third party owners in the criminal forfeiture context. See 910 F.2d at 350-51.[14]

_____

[14] The civil forfeiture provisions explicitly protect the interests of "innocent owners." See 21 U.S.C. § 881(a)(7) ("no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner"). The criminal forfeiture provisions of 21 U.S.C. § 853 contain no such innocent owner exception. See Jimerson, 5 F.3d at 1455 n.4. The Sixth Circuit reasoned, however, that Congress meant to protect the interests of third party owners (those who either had a superior interest in the subject property at the time of the acts giving rise to the forfeiture, or who were bona fide purchasers for value) in the criminal forfeiture context to the same degree as Congress protected innocent owners in the civil forfeiture context (thus extending our reasoning in One

20

In Leroy Lane II, the court found that upon dissolution of the marriage the government could execute on its interest in the residence because dissolution terminates the entireties estate under Michigan law;[15] but, invoking what we shall call the "timeline theory," the court also found that the government only "gets whatever [the defendant] possesses after the entireties estate is destroyed. In this case, by virtue

---

Single Family Residence). See Leroy Lane I, 910 F.2d at 350; see also Lester, 85 F.3d at 1414 n.8 ("it is clear that because a criminal forfeiture is an action against the convicted defendant, who by definition is not 'innocent,' there simply was no need to have an innocent-owner exception").

[15] In Leroy Lane I, the court determined that even though the government could not execute on its interest in a defendant spouse's share of a tenancy by the entireties while the interest was still intact, the government's interest was not extinguished. Instead, the government occupied a position during the tenancy "most analogous to the position occupied by a judgment creditor of one spouse . . . ." 910 F.2d at 351. In other words, the government would have a lien on the defendant spouse's interest in the property, which could be executed upon should the tenancy ever terminate. This is consistent with this court's decision in One Single Family Residence, holding that the government cannot execute on its interest in a defendant spouse's share of a tenancy by the entireties in the civil forfeiture context, but noting that,

> [n]othing would prevent the government from attempting to execute or levy on its interest should the entireties estate be altered by changes in circumstances or by court order. That is, we do not rule out the possibility that if the United States filed a lis pendens against the property, the government might acquire in a later forfeiture proceeding [the defendant's] interest in the property should he divorce his spouse, should [the defendant's spouse] predecease him, or should their interests be transmuted into some divisible form by their actions or by law. In such case, their interests would become distinct and separable so that forfeiture of his interest in the property would not affect her rights.

894 F.2d at 1516 n.6.

21

of the divorce court's distribution of the property, [the defendant] was left with no part of the property." Id. at 138.

Mrs. Kennedy finds further support for the Sixth Circuit's timeline theory from Florida case law holding that a state divorce court's award of property to one spouse takes effect at the moment the entireties interest is destroyed. Under Florida law, during the life of an entireties estate, "creditors cannot levy on entireties property to satisfy the debt of an individual spouse." One Single Family Residence, 894 F.2d at 1515. Upon dissolution of the marriage, however, a tenancy by the entireties automatically becomes a tenancy in common if no other disposition is made by the divorce court. Prior to the Florida Supreme Court's decision in Sharp v. Hamilton, 520 So.2d 9 (Fla. 1988), some single spouse creditors argued that even when a divorce court awarded certain property in fee to the non-debtor spouse, at the conclusion of the entireties estate the creditor's interest could attach to the property because before the divorce court's order could take effect, the property was held in a tenancy in common for "the twinkling of a legal eye." The Florida Supreme Court responded:

> Even though . . . a tenancy by the entirety becomes a tenancy in common by operation of law upon dissolution of marriage, we reject the "twinkling of a legal eye" analysis . . . . Entireties property is not subject to a lien against only one tenant. We are not persuaded by the fiction fashioned by [the lower court] that there is a moment in time in which a judgment lien or a mortgage lien held against one of the tenants attaches to the entireties property upon dissolution when sole title to the property is awarded to one spouse in settlement of divorce by a final decree of

22

> dissolution. . . . [T]he judgment of dissolution in this case, the same document that operates to make tenants by the entirety into tenants in common, also ordered sole title to the property be vested in Mrs. Hamilton. . . . [T]he judgment of dissolution is controlling and the transfer of the husband's interest to the wife pursuant to the judgment of dissolution was equivalent to the defeasance of the husband's interest in the property which would have occurred had he predeceased his wife while the parties were still married.

Id. at 10.  Mrs. Kennedy argues that ownership of the Sunset Way property flowed seamlessly from her and Kennedy as tenants by the entireties, to her alone as sole owner by virtue of the divorce court's decree.  Under the timeline theory, therefore, because the Government was precluded from executing its interest in  Kennedy's share of the entireties estate during the marriage, and because the divorce court awarded Mrs. Kennedy a special equity in the whole property upon dissolution of the marriage, there was never a moment in time when the Government's interest could attach.  What the Government could not execute upon during the marriage has disappeared upon divorce.

The problem with the timeline theory is that it evaluates the Government's interest along a linear continuum, when what the statute directs is that we look at whether the Government can execute on its interest in forfeited property at the moment it seeks to do so.  At this moment, Mrs. Kennedy holds property that was forfeited by final order to United States; pursuant to an indictment, a jury returned a special verdict finding that the Sunset Way property either was involved or was

23

property traceable to property that was involved in unlawful monetary transactions, and the district court issued an order forfeiting Kennedy's interest. Under section 853(n), subsequent to a final order of forfeiture it became Mrs. Kennedy's burden to come forward and demonstrate either that she had superior title to the property at the time of the act giving rise to the forfeiture, or that she is a bona fide purchaser for value of Kennedy's interest. 21 U.S.C. § 853(n)(6). As we have already concluded, she can prevail under neither rationale.

Our decision in One Single Family Residence does not lead naturally to the Sixth Circuit's conclusion in Leroy Lane II. In One Single Family Residence, we found in the context of civil forfeiture that even when a spouse's interest in property held by the entireties is subject to forfeiture, the government cannot execute on its interest during the tenancy if the other spouse is an "innocent owner" under 21 U.S.C. 881(a)(7) because,

> the government cannot deprive [the innocent spouse] of any interest she has in the property. The interest she has under Florida law is an undivided right of possession, title, and enjoyment of the whole property. To convert this right into a tenancy in common, where she has only the right to a portion of the property or a portion of the proceeds should the government pursue partition–which could not occur with an entireties estate–appears to us to be a taking without due process violating the Fifth Amendment of the federal constitution.
> . . . .
> To forfeit some interest in the property to the government would penalize [the innocent owner] for the wrongdoing of her husband, in

24

which she neither participated nor had any knowledge, and would take her property without due process or just compensation.

894 F.2d at 1516. We have never held that One Single Family Residence applies in the criminal forfeiture context, and we do not do so today.[16] Even if we were to hold that One Single Family Residence applies in the instant case, however, it would not shield Mrs. Kennedy from forfeiture now. One Single Family Residence would protect Mrs. Kennedy's interest in a tenancy by the entireties so that the Government would not have been able to execute on its interest while her marriage to Kennedy was still intact. It is undisputed, however, that the marriage is now dissolved and that the entireties interest has been destroyed. We therefore have an answer to the question presented by the Sixth Circuit's timeline theory: At what moment in time could the Government's interest attach to the forfeited property? The answer is now. It is true that Mrs. Kennedy has been awarded the whole Sunset Way property by the divorce court; but the portion of the property represented by Kennedy's former interest in the entireties estate has been forfeited. It is therefore Mrs. Kennedy's burden to come

---

[16] Indeed, the court in One Single Family Residence was careful to note that its decision was heavily dependent on state law, and that "Congress expressly preempted state law in the language of 21 U.S.C. section 853(a) (Supp. 1984), created in the same act as section 881(a)(7), by providing for criminal forfeiture of property, 'irrespective of any provision of State law,' if that property was [subject to forfeiture]." 894 F.2d at 1518.

25

forward and demonstrate why the subject property should not be taken by the order of forfeiture. She has failed to do so, and so the property remains forfeited.

We can also assume that even though federal law decides what interests are subject to forfeiture under section 853, state property law defines what those interests are in the first instance. See Lester, 85 F.3d at 1412; United States v. Ben-Hur, 20 F.3d 313, 317 (7th Cir. 1994); Leroy Lane I, 910 F.2d at 348. No preemption is necessary because our decision today does not conflict with Florida law. We have taken due notice of the state divorce court's award of a special equity in the whole Sunset Way property to Mrs. Kennedy pursuant to state family law. That award does not affect our conclusion that Kennedy's former interest in the property was forfeited under federal law, and that Mrs. Kennedy is not entitled to that interest under either section 853(n)(6)(A) or (B). Our holding today is a natural consequence of the fact that federal law provides only two avenues of relief for third parties seeking to establish their interest in criminally forfeited property, and the fact that federal law decides what interests are subject to forfeiture. Third parties can argue that they held superior title at the time of the act giving rise to the forfeiture, or that they are bona fide purchasers for value. They cannot argue, however, that a state divorce court awarded them a special equity in the forfeited property; there is no "special equity provision" in section 853(n)(6).

The Sixth Circuit's timeline theory threatens completely to subordinate federal law not to state property law, but to state judges who are given carte blanche to decide what interests the United States – not even a party to the divorce proceeding – will be able to execute upon after the dissolution of the marriage, and to defendants who may collude with their spouses to avoid forfeiture. Under Leroy Lane II, for example, it is unclear why the defendant spouse would not be able to avoid forfeiture by simply giving his interest in the property to his spouse. The gift would destroy the tenancy, thereby removing the barrier to the government's execution of its lien, but there would be nothing left for the government to take. The gift would effectively defease not only the interest of the guilty spouse, but the interest of the government as well. See also Sharp, 520 So.2d at 10 (finding, for purposes of creditor rights, that an award of special equity has the same effect as if one spouse transferred his or her interest in the property to the other by quit-claim deed either before or at dissolution of the marriage).[17] This result was clearly not intended by Congress. The criminal forfeiture

---

[17] In the instant case, the district court found that the divorce court's award of a special equity to Mrs. Kennedy was justified under state law. What actually occurred, of course, is that the divorce court merely adopted the parties' agreement that Mrs. Kennedy should be granted all right, title, and interest in the Sunset Way property. We do not question the propriety of a state court's incorporation of a property settlement in a divorce decree; but it seems absurd to argue, as does Mrs. Kennedy, that divorcing spouses can act by agreement to defease the government of its lawful interest in forfeited property in a proceeding in which the government is not even a party.

provisions provide only two ways for third parties to establish their interest in forfeited property; and one of them is emphatically <u>not</u> that the criminal defendant gave the third party a gift. The relation back provision contained in 21 U.S.C. § 853(c), vesting all right, title, and interest in the forfeited property in the United States upon the commission of the acts giving rise to the forfeiture, was specifically included in section 853 as a way of avoiding such transfers. <u>See</u> <u>Ben-Hur</u>, 20 F.3d at 319; <u>Reckmeyer</u>, 836 F.3d at 203.

## IV.

For the foregoing reasons, we REVERSE the district court's order granting Mrs. Kennedy's petition to establish her interest in the forfeited property, and REMAND with instructions that the district court reinstate the order of forfeiture.

REVERSED and REMANDED.

TJOFLAT, Circuit Judge:

The ultimate question in this case is whether a state divorce court can defease the United States of its interest in property forfeited under the criminal forfeiture provisions of 18 U.S.C. § 982 (1994) and 21 U.S.C. § 853 (1994). We answer this question in the negative.

## I.

## A.

On January 27, 1995, a federal grand jury in the Middle District of Florida indicted Byron Kennedy ("Kennedy") on twelve counts of mail fraud in violation of 18 U.S.C. § 1341 (1994),[18] and two counts of unlawful monetary transactions in

---

[18] 18 U.S.C. § 1341 provides, in pertinent part:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a

violation of 18 U.S.C. § 1957 (1994).[19]  The indictment included a forfeiture count

_____

financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

[19] 18 U.S.C. § 1957 provides, in pertinent part:

(a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

(b)(1) Except as provided in paragraph (2), the punishment for an offense under this section is a fine under title 18, United States Code, or imprisonment for not more than ten years or both.

(2) The court may impose an alternate fine to that imposable under paragraph (1) of not more than twice the amount of the criminally derived property involved in the transaction.

. . . .

(d) The circumstances referred to in subsection (a) are –

(1) that the offense under this section takes place in the United States . . . .

. . . .

(f) As used in this section –

(1) the term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of this title) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title

. . . .

(2) the term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense; and

(3) the term "specified unlawful activity" has the meaning given that term in section 1956 of this title.

Section 1956(c)(7)(A) defines "specified unlawful activity" as "any act or activity constituting an offense listed in section 1961(1) of [title 18] except an act which is

which alleged that Kennedy's interest, to the extent of $177,445.05, in a beach house located at 2910 Sunset Way, St. Petersburg Beach, Florida, was forfeitable to the United States pursuant to 18 U.S.C. § 982 because it was acquired with proceeds of criminal activity.[20]

Continental Graphics, Inc. ("CGI")[21] was engaged in the business of selling yearbooks to high school students, and Kennedy was its sales representative for several Florida schools. The indictment alleged that between April 1984 and December 1990, Kennedy engaged in a scheme to defraud CGI of over $800,000 by stealing monies paid by students (to their schools) for yearbooks. The scheme was not complicated. On April 4, 1984, Kennedy convinced CGI to cease billing the schools directly, and instead to allow him (through his company, Byron Kennedy & Co.) to bill them. Kennedy told CGI that he would instruct the schools to mail their payments

indictable under subchapter II of chapter 53 of title 31." A violation of section 1341 (relating to mail fraud) is listed as an offense in section 1961(1).

[20] 18 U.S.C. § 982(a)(1) provides, in pertinent part:
The court, in imposing sentence on a person convicted of an offense in violation of section . . . 1957 . . . of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.
Section 982(b)(1) provides that "[t]he forfeiture of property under this section . . . shall be governed by . . . [21 U.S.C. § 853]." We discuss section 853, which is at the heart of this appeal, in part III.

[21] CGI was originally named Delmar Printing Company, Inc.; the indictment reads accordingly.

to a post office box in St. Petersburg, Florida, which would be under the control of the Bank of Florida. The bank was to act as an agent of CGI, and to deposit in a CGI account all the monies received. All remittances to the account were to be the sole property of CGI, and Kennedy would not have the right to withdraw or receive any of the account funds, or to collect any of the payments directly from the schools. The April 4 agreement provided that Kennedy would instruct the schools to send their payments to Post Office Box 10933.

Kennedy altered the invoices, however, so as to instruct schools to send their payments to P.O. Box 10937. Only Kennedy had access to Box 10937. When CGI became concerned that the new arrangement had led to an alarming rate of past due invoices, Kennedy told the company that he had no idea why payments were not being received. In the meantime, Kennedy was pocketing thousands of dollars that schools had mistakenly sent to his personal post office box, in violation of 18 U.S.C. § 1341. The indictment also alleged that Kennedy had converted $177,445.05 of the stolen money by purchasing a beach house at 2910 Sunset Way in St. Petersburg, in violation of 18 U.S.C. § 1957. On the same day the indictment was returned, the Government recorded its notice of lis pendens on the property.

On July 28, a jury found Kennedy guilty on all counts and also returned a special verdict finding that the Sunset Way property "was involved in the unlawful

32

monetary transaction [prohibited by 18 U.S.C. § 1957] . . . , or is property traceable to property which was involved in the unlawful monetary transaction . . . ." On November 30, the district court issued an order forfeiting all Kennedy's right, title, and interest in the Sunset Way property to the United States, pursuant to 18 U.S.C. § 982.[22] The court also sentenced Kennedy to fifty-seven months imprisonment, three years of supervised release, and ordered restitution in the amount of $832,011 to be paid to CGI.

B.

---

[22] The court styled its order a "Preliminary Order of Forfeiture," but we treat it as a final order because courts are not at liberty to enter preliminary forfeiture orders at the sentencing phase of a criminal proceeding. Under Federal Rule of Criminal Procedure 32(d)(2), "[i]f a verdict contains a finding that property is subject to a criminal forfeiture . . . the court may enter a preliminary order of forfeiture after providing notice to the defendant and a reasonable opportunity to be heard on the timing and form of the order." Preliminary forfeiture orders, however, are primarily used to enable the Government to marshal the defendant's assets subject to forfeiture.

> The [preliminary] order of forfeiture shall authorize the Attorney General to seize the property subject to forfeiture, to conduct any discovery that the court considers proper to help identify, locate, or dispose of the property, and to begin proceedings consistent with any statutory requirements pertaining to ancillary hearings and the rights of third parties.

Fed. R. Crim. P. 32(d)(2). The rule makes clear that "[a]t sentencing, a final order of forfeiture shall be made part of the sentence and included in the judgment." Id. Because the district court entered its order at the time it sentenced Kennedy, the order was properly a final order of forfeiture.

33

After the court entered its order of forfeiture, three parties filed petitions in the district court seeking to adjudicate their interests in the Sunset Way property in accordance with 21 U.S.C. § 853(n)(2):[23] (1) CGI; (2) Verness Kennedy ("Mrs. Kennedy"), Kennedy's former spouse; and (3) the Pinellas County Teachers Credit Union (the "Credit Union"), which held a mortgage on the Sunset Way property. The district court assigned the case to a magistrate judge who held a hearing and made appropriate findings of fact. Following, we summarize the findings of fact adopted by the district court pertaining to the interests of CGI, Mrs. Kennedy, and the Credit Union.

In June 1989, the Kennedys entered into a real estate contract to purchase the Sunset Way beach house for $542,500. By then they had been married for almost

---

[23] As noted, supra, section 982(b)(1) provides that forfeiture of property under that section is governed by the criminal forfeiture provisions of 21 U.S.C. § 853. Under section 853(k), third parties are barred from attempting to establish their interest in property subject to forfeiture until a final order of forfeiture has been entered. They may not intervene in the criminal action against the defendant in which the Government establishes its right to forfeiture, nor may they initiate a civil action to adjudicate the validity of their interest once an indictment or information has been filed. See 21 U.S.C. § 853(k). Section 853(n)(2) provides that following the entry of an order of forfeiture,

> [a]ny person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United states pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice . . . , whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property.

thirty-one years. Their four sons were grown. Mrs. Kennedy considered their old house too large and costly to upkeep, and she no longer liked their old neighborhood. To her, the beach house she had spotted for sale offered more. Her husband, however, did not share her enthusiasm. Because of his reluctance and her desire for change, Mrs. Kennedy committed much of her personal wealth to convince him to join her in purchasing the residence.

Mrs. Kennedy had worked throughout most of the marriage. She taught in the public school system, modeled, refinished furniture, and owned (and continues to own) Patti and Friends Antique Mall, a business that rents booths to about eighty vendors. She had inherited securities after her mother's death in 1968, and knew by June 1989 that she could expect to receive a significant inheritance due to her father's recent death. Consequently, Mrs. Kennedy thought she would have the financial means to contribute toward the purchase of the new home.

Unfortunately, at the time she wanted to execute a contract on the Sunset Way property, Mrs. Kennedy did not have the means in hand. Her inheritance had not come through, and the Kennedys had not yet sold their old residence. Therefore, in June 1989, Mrs. Kennedy promised to repay her husband if he would make the $50,000 earnest money deposit. Kennedy agreed, telling his wife that he would borrow the money from his business.

The couple acquired the property in September 1989. At the closing, they paid the sellers $134,445.05 in cash and assumed an existing $356,000 mortgage held by the Credit Union. As with the earnest money deposit, Kennedy advanced the cash payment (again telling his wife that he was borrowing the money from his business) with the understanding that Mrs. Kennedy would repay him either when she received her inheritance or when their old house sold. Though Mrs. Kennedy was unaware of her husband's improprieties, it is undisputed that the $184,445.05.[24] contributed by Kennedy toward the purchase of the beach house was money stolen from CGI.

The district court found that when the Kennedys closed on the beach house in September 1989, they owned the property as tenants by the entireties, meaning that each spouse had "an indivisible right to own and occupy the entire property." United States v. One Single Family Residence With Out Bldgs., 894 F.2d 1511, 1515 (11th Cir. 1990). Despite their joint ownership, Mrs. Kennedy kept her promise to repay her husband almost the full amount of the funds that he had contributed toward the purchase of the residence. After her inheritance came through, and the couple's old house sold, Mrs. Kennedy wrote her husband three checks totaling $180,000.[25]

---

[24] The $184,445.05 figure comprises the sum of the $50,000 earnest money deposit and the $134,445.05 cash payment made to the sellers at closing.

[25] The dates of the three checks written by Mrs. Kennedy to her husband were December 17, 1989 ($100,000), February 15, 1991 ($40,000), and March 7, 1991

36

Mrs. Kennedy first learned of her husband's fraud in May 1991. As noted above, Kennedy was indicted on charges of mail fraud and unlawful monetary transactions a little less than four years later, on January 27, 1995; this was the same day that the Government recorded its notice of lis pendens on the Sunset Way residence. Two months later, Mrs. Kennedy filed for a divorce. At a domestic mediation conference held to establish the financial terms of the divorce, the parties agreed that Mrs. Kennedy had a "special equity" in the beach house; this was largely because, including the funds Mrs. Kennedy had used to repay her husband for his contributions at the time of purchase, Mrs. Kennedy produced checks totaling more than $392,412 that she had invested in the property.[26] Accordingly, Kennedy agreed to transfer any rights he possessed in the property to her. On September 19, 1995, the state court entered a divorce decree which adopted the mediation agreement, awarded the Sunset Way property to Mrs. Kennedy because of her agreed upon special equity in the residence, and dissolved the marriage.[27] More than a month later on November

($40,000). Her last check to her husband was actually written for $119,000, but it included his share of the proceeds from the sale of their former residence ($79,000).

[26] In addition to repaying her husband, the district court found that Mrs. Kennedy made 87% of the mortgage payments, paid the taxes on the property, and took care of most of the maintenance costs.

[27] Through an oversight, the final divorce decree entered on September 19, 1995 did not address the disposition of the Sunset Way property. The Kennedys brought

30, 1995, the United States District Court for the Middle District of Florida entered its order forfeiting to the United States all Kennedy's right, title, and interest in the Sunset Way property.

C.

Under 21 U.S.C. § 853(n)(6), third party petitioners can establish their interest in forfeited property in only two ways. See United States v. Reckmeyer, 836 F.2d 200, 203 (4th Cir. 1987) ("Subsection (n) provides the only means for third parties to establish their interest in forfeited property."). The statute provides:

> If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that–
>
> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or
> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

this omission to the attention of the divorce court which, on January 2, 1996, corrected its error; the court entered an order, awarding Mrs. Kennedy a special equity in the house, nunc pro tunc to September 19, 1995. In its findings, the district court characterized the divorce court's omission as "scrivener's error."

the court shall amend the order of forfeiture in accordance with its determination.

21 U.S.C. § 853(n)(6).

> Thus subsection (n)(6) protects only two classes of petitioners, those whose legal interests in the property were superior to the defendant[] at the time the interest of the United States vested through the commission of an act giving rise to forfeiture and "bona fide purchasers for value" without knowledge of the forfeitability of the defendant's assets.

Reckmeyer, 836 F.2d at 204; see also United States v. Jimerson, 5 F.3d 1453, 1455

(11th Cir. 1993).

The district court concluded that Mrs. Kennedy prevails under either section.

The court found that

> Mrs. Kennedy is a bona fide purchaser for value and that she has a legal interest in the Sunset Way property resulting in a superior right to the defendant's former interest in the property pursuant to 21 U.S.C. §§ 853(n)(6)(A) & (B). Therefore, under the applicable law, forfeiture of [ Kennedy's interest in] the residence is inappropriate.

The court thus modified its November 30, 1995 order of forfeiture, and granted both

Mrs. Kennedy's and the Credit Union's petitions to establish their interests in the

forfeited property, with the Credit Union having priority as a mortgagee. The court

also denied CGI's petition to establish its interest in the forfeited property. The

Government and CGI now appeal. All parties agree that the government's interest,

if any, is limited to Kennedy's one-half interest in the property. Mrs. Kennedy's one-

half interest was never subject to forfeiture, and it remains unaffected by our decision today.

## II.

We review the district court's findings of fact for clear error. We independently review the court's conclusions of law de novo. See One Single Family Residence, 894 F.2d at 1513. Though CGI challenges some of the district court's factual findings, our review of the record convinces us at the outset that the court's findings of fact are not clearly erroneous. Our review is therefore limited to questions of law.

## III.

The criminal forfeiture provisions of section 853 authorize the government to seek forfeiture of a defendant's interest in subject property. See United States v. Lester, 85 F.3d 1409, 1413 (9th Cir. 1996). This is in contrast to the civil forfeiture scheme embodied in 21 U.S.C. § 881, involving an in rem proceeding, wherein the whole property (as opposed to a particular defendant's interest in the property) is treated as being itself guilty of wrongdoing. See United States v. One 1976 Mercedes Benz 280S, 618 F.2d 453, 454 (7th Cir. 1980). Thus, we must decide whether

Kennedy's interest in the Sunset Way property is properly forfeitable to the United States, or whether Mrs. Kennedy has established either (a) that she is a bona fide purchaser for value of Kennedy's interest in the real estate, or (b) that she had an interest in the property that was superior to Kennedy's interest at the time he committed the acts giving rise to the forfeiture.

## A.

The district court concluded that Mrs. Kennedy became a bona fide purchaser for value as of the date that she and her husband closed on the Sunset Way property. The court found,

> Mrs. Kennedy, along with her husband, purchased the Sunset Way residence from the sellers on September 1, 1989. She was unaware that the money her husband used toward the down payments was criminally obtained. Thus, pursuant to § 853(n)(6)(B), Mrs. Kennedy purchased the residence as a "bona fide purchaser for value" who was both "reasonable" and "without cause to believe that the property was subject to forfeiture" at the time of purchase.

This analysis does not address the real question, which is, did Mrs. Kennedy ever purchase her former husband's interest in the subject property. Of course Mrs. Kennedy became a "bona fide purchaser for value" of some part of the Sunset Way property on September 1, 1989, because along with her then-husband she assumed a $356,000 mortgage on the property. Specifically, she purchased a spousal interest in

41

a tenancy by the entireties under Florida law, "an indivisible right to own and occupy the entire property." One Single Family Residence, 894 F.2d at 1515.[28] But this bona fide purchase for value is irrelevant under section 853(n)(6)(B). The statute asks whether a third party petitioner ever became a bona fide purchaser for value of the defendant's interest in the subject property. Finding that Mrs. Kennedy is a bona fide purchaser for value of her own interest in the tenancy by the entireties is not relevant. The question is, did she ever purchase Kennedy's interest in the property.

Once the question is properly framed, it becomes clear that Mrs. Kennedy cannot prevail under the bona fide purchaser exception. Mrs. Kennedy argues that she did indeed purchase Kennedy's interest in the property because she repaid the funds Kennedy contributed as an earnest money deposit and at closing with her separate inheritance money. She characterizes Kennedy's initial contributions as a loan, whereby neither she nor her former husband ever intended that any part of the Sunset Way property be owned by him; and she reminds the court that it was she, and not Kennedy, who wanted to buy the beach residence in the first place, and that Kennedy

---

[28] In One Single Family Residence, 849 F.2d at 1514, this court explained, [t]o hold property by the entireties, Florida common law requires five 'unites' to be present: marriage–the joint owners must be married to each other; title–the owners must both have title to the property; time–they both must have received title from the same conveyance; interest–they must have an equal interest in the whole of the property; and control or possession–they both must have the right to use the entire property.

42

would never have consented to the purchase while they were married had she not promised to repay him all the monies he initially invested. But this argument is belied by the plain fact that the couple took title to the property jointly, as tenants by the entireties. A tenancy by the entireties is an ownership arrangement peculiar to marriage, the most significant aspect of which is its distribution of property between two people who form, in the eyes of the law, a unity. Under the Florida law,

> [a]s long as all the unities remain intact . . . each spouse's interest comprises the whole or entirety of the property and not a divisible part; the estate is inseverable. Neither spouse can sell, forfeit or encumber any part of the estate without the consent of the other, nor can one spouse alone lease it or contract for its disposition. Creditors cannot levy on entireties property to satisfy the debt of an individual spouse. The state cannot deem entireties property forfeit because of the unlawful conduct of one spouse acting alone.

One Single Family Residence, 894 F.2d at 1514-15 (internal citations and quotation marks omitted). To argue that both spouses always intended Mrs. Kennedy to be the sole owner of the property seems strained at best, given that she and Kennedy entered into a form of ownership most notable for its joint encumberments.[29] The argument

---

[29] The couple might have assumed joint ownership of the property as a way of giving Kennedy collateral for his "loan" to Mrs. Kennedy for the earnest money deposit and the cash payment made at closing. If this were the case, however, one would expect that Kennedy would have transferred all his interest in the property by quitclaim deed sometime immediately after March 7, 1991, when Mrs. Kennedy paid him the last of the $180,000 that was owed him. But Kennedy did not execute a quitclaim deed on the property in favor of Mrs. Kennedy until the two were divorced in 1995. Until that time, they continued to own the beach residence as tenants by the

is also undermined by Mrs. Kennedy's own testimony during the third party ancillary proceeding in which she told the court that it was her understanding that she and Kennedy both owned the Sunset Way residence during the marriage. There is simply no evidence that Mrs. Kennedy ever became a bona fide purchaser for value of Kennedy's interest in the beach house through a genuine arms-length transaction, and therefore Mrs. Kennedy cannot prevail under section 853(n)(6)(B).

B.

i.

The district court also found that Mrs. Kennedy could escape forfeiture of her former husband's interest in the property under the superior title provisions of section 853(n)(6)(A). The court reasoned that because the divorce court had granted Mrs. Kennedy a special equity in the home upon dissolution of the marriage, and directed Kennedy to transfer to her all his right, title, and interest in the home, Mrs. Kennedy had an interest in the whole property that was superior to his. Florida law does recognize a special equity upon divorce when one spouse can demonstrate that (1) he or she paid for certain property from a source unconnected with the marriage, and (2) a gift to the other spouse was not intended. See Robertson v. Robertson, 593 So.2d

entireties.

44

491, 494 (Fla. 1991). The special equity "only comes into actual identifiable form," however, "upon the termination of the marriage status." Bosch v. United States, 590 F.2d 165, 167 (5th Cir. 1979).[30] The former fifth circuit held, in Bosch, that the equity actually "exist[s] prior to the divorce." Id. The award upon dissolution of the marriage is merely a judicial recognition of an already-existing interest that came into being when the spouse holding the equity made a significant nonmarital investment in the property. There is no question, however, that the earliest point at which the interest can vest is "at a point in time when [the spouse] makes a contribution of funds, property, or services toward acquisition or betterment of property from a source unconnected with the marriage." Starcher v. Starcher, 391 So.2d 340, 341 (Fla. 4th DCA 1980). The earliest point at which Mrs. Kennedy's special equity could have vested was December 1989, when she first began using her inheritance money to pay back her husband for his initial contributions.

Section 853(n)(6)(A) requires a third party petitioner to establish that he or she had an interest in the subject property that "was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this

---

[30] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down on or before September 30, 1981.

section." 21 U.S.C. § 853(n)(6)(A) (emphasis added). The acts which gave rise to the forfeiture took place in June 1989, when Kennedy used $50,000 of money stolen from CGI as an earnest money deposit for the property, and September 1989, when Kennedy used $134,445.05 in stolen funds as a cash payment at closing. This was months before the earliest time at which Mrs. Kennedy's special equity could have vested. At the time of the acts giving rise to the forfeiture, Mr. and Mrs. Kennedy took title to the property as tenants by the entireties. The state court's grant of a special equity, even with its recognition of an interest in Mrs. Kennedy that was vested prior to dissolution, does not alter that conclusion. Because we have explicitly held in Jimerson, 5 F.3d at 1455, that "[t]he very nature of the tenancy by the entireties prevents [a petitioner] from claiming that her title is superior to her husband's," we conclude that Mrs. Kennedy cannot prevail under section 853(n)(6)(A) because even if she had an interest that was superior to her former husband's, no such interest was vested at the time of the act giving rise to the forfeiture.

ii.

Mrs. Kennedy contends that the Sixth Circuit's decision in United States v. Certain Real Property Located at 2525 Leroy Lane (Leroy Lane II), 972 F.2d 136 (6th

Cir. 1992), is both on point and persuasive. We agree that the decision is on point; after consideration, however, we cannot agree that it is persuasive. In Leroy Lane II, the government sought both civil and criminal forfeiture of the defendant's residence, held prior to divorce by him and his wife as tenants by the entireties. Upon dissolution of the marriage, the divorce court awarded the whole property to the wife "free and clear of any and all claims or interest of the Defendant." Id. at 137. Citing this court's decision in One Single Family Residence, the Sixth Circuit concluded in United States v. Certain Real Property Located at 2525 Leroy Lane (Leroy Lane I), 910 F.2d 343, 351-52 (6th Cir. 1990), that the government could not execute on a defendant's interest in a tenancy by the entireties while the interest was still intact, even if such interest was subject to forfeiture. To do so would burden the interests of "innocent owners" in the civil forfeiture context, see 21 U.S.C. § 881(a)(7) (1994), and of third party owners in the criminal forfeiture context. See 910 F.2d at 350-51.[31]

_____

[31] The civil forfeiture provisions explicitly protect the interests of "innocent owners." See 21 U.S.C. § 881(a)(7) ("no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner"). The criminal forfeiture provisions of 21 U.S.C. § 853 contain no such innocent owner exception. See Jimerson, 5 F.3d at 1455 n.4. The Sixth Circuit reasoned, however, that Congress meant to protect the interests of third party owners (those who either had a superior interest in the subject property at the time of the acts giving rise to the forfeiture, or who were bona fide purchasers for value) in the criminal forfeiture context to the same degree as Congress protected innocent owners in the civil forfeiture context (thus extending our reasoning in One

47

In Leroy Lane II, the court found that upon dissolution of the marriage the government could execute on its interest in the residence because dissolution terminates the entireties estate under Michigan law;[32] but, invoking what we shall call the "timeline theory," the court also found that the government only "gets whatever [the defendant] possesses after the entireties estate is destroyed. In this case, by virtue

---

Single Family Residence). See Leroy Lane I, 910 F.2d at 350; see also Lester, 85 F.3d at 1414 n.8 ("it is clear that because a criminal forfeiture is an action against the convicted defendant, who by definition is not 'innocent,' there simply was no need to have an innocent-owner exception").

[32] In Leroy Lane I, the court determined that even though the government could not execute on its interest in a defendant spouse's share of a tenancy by the entireties while the interest was still intact, the government's interest was not extinguished. Instead, the government occupied a position during the tenancy "most analogous to the position occupied by a judgment creditor of one spouse . . . ." 910 F.2d at 351. In other words, the government would have a lien on the defendant spouse's interest in the property, which could be executed upon should the tenancy ever terminate. This is consistent with this court's decision in One Single Family Residence, holding that the government cannot execute on its interest in a defendant spouse's share of a tenancy by the entireties in the civil forfeiture context, but noting that,

> [n]othing would prevent the government from attempting to execute or levy on its interest should the entireties estate be altered by changes in circumstances or by court order. That is, we do not rule out the possibility that if the United States filed a lis pendens against the property, the government might acquire in a later forfeiture proceeding [the defendant's] interest in the property should he divorce his spouse, should [the defendant's spouse] predecease him, or should their interests be transmuted into some divisible form by their actions or by law. In such case, their interests would become distinct and separable so that forfeiture of his interest in the property would not affect her rights.

894 F.2d at 1516 n.6.

of the divorce court's distribution of the property, [the defendant] was left with no part of the property." Id. at 138.

Mrs. Kennedy finds further support for the Sixth Circuit's timeline theory from Florida case law holding that a state divorce court's award of property to one spouse takes effect at the moment the entireties interest is destroyed. Under Florida law, during the life of an entireties estate, "creditors cannot levy on entireties property to satisfy the debt of an individual spouse." One Single Family Residence, 894 F.2d at 1515. Upon dissolution of the marriage, however, a tenancy by the entireties automatically becomes a tenancy in common if no other disposition is made by the divorce court. Prior to the Florida Supreme Court's decision in Sharp v. Hamilton, 520 So.2d 9 (Fla. 1988), some single spouse creditors argued that even when a divorce court awarded certain property in fee to the non-debtor spouse, at the conclusion of the entireties estate the creditor's interest could attach to the property because before the divorce court's order could take effect, the property was held in a tenancy in common for "the twinkling of a legal eye." The Florida Supreme Court responded:

> Even though . . . a tenancy by the entirety becomes a tenancy in common by operation of law upon dissolution of marriage, we reject the "twinkling of a legal eye" analysis . . . . Entireties property is not subject to a lien against only one tenant. We are not persuaded by the fiction fashioned by [the lower court] that there is a moment in time in which a judgment lien or a mortgage lien held against one of the tenants attaches to the entireties property upon dissolution when sole title to the property is awarded to one spouse in settlement of divorce by a final decree of

49

> dissolution. . . . [T]he judgment of dissolution in this case, the same document that operates to make tenants by the entirety into tenants in common, also ordered sole title to the property be vested in Mrs. Hamilton. . . . [T]he judgment of dissolution is controlling and the transfer of the husband's interest to the wife pursuant to the judgment of dissolution was equivalent to the defeasance of the husband's interest in the property which would have occurred had he predeceased his wife while the parties were still married.

Id. at 10. Mrs. Kennedy argues that ownership of the Sunset Way property flowed seamlessly from her and Kennedy as tenants by the entireties, to her alone as sole owner by virtue of the divorce court's decree. Under the timeline theory, therefore, because the Government was precluded from executing its interest in Kennedy's share of the entireties estate during the marriage, and because the divorce court awarded Mrs. Kennedy a special equity in the whole property upon dissolution of the marriage, there was never a moment in time when the Government's interest could attach. What the Government could not execute upon during the marriage has disappeared upon divorce.

The problem with the timeline theory is that it evaluates the Government's interest along a linear continuum, when what the statute directs is that we look at whether the Government can execute on its interest in forfeited property at the moment it seeks to do so. At this moment, Mrs. Kennedy holds property that was forfeited by final order to United States; pursuant to an indictment, a jury returned a special verdict finding that the Sunset Way property either was involved or was

50

property traceable to property that was involved in unlawful monetary transactions, and the district court issued an order forfeiting Kennedy's interest. Under section 853(n), subsequent to a final order of forfeiture it became Mrs. Kennedy's burden to come forward and demonstrate either that she had superior title to the property at the time of the act giving rise to the forfeiture, or that she is a bona fide purchaser for value of Kennedy's interest. 21 U.S.C. § 853(n)(6). As we have already concluded, she can prevail under neither rationale.

Our decision in One Single Family Residence does not lead naturally to the Sixth Circuit's conclusion in Leroy Lane II. In One Single Family Residence, we found in the context of civil forfeiture that even when a spouse's interest in property held by the entireties is subject to forfeiture, the government cannot execute on its interest during the tenancy if the other spouse is an "innocent owner" under 21 U.S.C. 881(a)(7) because,

> the government cannot deprive [the innocent spouse] of any interest she has in the property. The interest she has under Florida law is an undivided right of possession, title, and enjoyment of the whole property. To convert this right into a tenancy in common, where she has only the right to a portion of the property or a portion of the proceeds should the government pursue partition–which could not occur with an entireties estate–appears to us to be a taking without due process violating the Fifth Amendment of the federal constitution.
> . . . .
> To forfeit some interest in the property to the government would penalize [the innocent owner] for the wrongdoing of her husband, in

51

which she neither participated nor had any knowledge, and would take her property without due process or just compensation.

894 F.2d at 1516. We have never held that One Single Family Residence applies in the criminal forfeiture context, and we do not do so today.[33] Even if we were to hold that One Single Family Residence applies in the instant case, however, it would not shield Mrs. Kennedy from forfeiture now. One Single Family Residence would protect Mrs. Kennedy's interest in a tenancy by the entireties so that the Government would not have been able to execute on its interest while her marriage to Kennedy was still intact. It is undisputed, however, that the marriage is now dissolved and that the entireties interest has been destroyed. We therefore have an answer to the question presented by the Sixth Circuit's timeline theory: At what moment in time could the Government's interest attach to the forfeited property? The answer is now. It is true that Mrs. Kennedy has been awarded the whole Sunset Way property by the divorce court; but the portion of the property represented by Kennedy's former interest in the entireties estate has been forfeited. It is therefore Mrs. Kennedy's burden to come

---

[33] Indeed, the court in One Single Family Residence was careful to note that its decision was heavily dependent on state law, and that "Congress expressly preempted state law in the language of 21 U.S.C. section 853(a) (Supp. 1984), created in the same act as section 881(a)(7), by providing for criminal forfeiture of property, 'irrespective of any provision of State law,' if that property was [subject to forfeiture]." 894 F.2d at 1518.

forward and demonstrate why the subject property should not be taken by the order of forfeiture. She has failed to do so, and so the property remains forfeited.

We can also assume that even though federal law decides what interests are subject to forfeiture under section 853, state property law defines what those interests are in the first instance. See Lester, 85 F.3d at 1412; United States v. Ben-Hur, 20 F.3d 313, 317 (7th Cir. 1994); Leroy Lane I, 910 F.2d at 348. No preemption is necessary because our decision today does not conflict with Florida law. We have taken due notice of the state divorce court's award of a special equity in the whole Sunset Way property to Mrs. Kennedy pursuant to state family law. That award does not affect our conclusion that Kennedy's former interest in the property was forfeited under federal law, and that Mrs. Kennedy is not entitled to that interest under either section 853(n)(6)(A) or (B). Our holding today is a natural consequence of the fact that federal law provides only two avenues of relief for third parties seeking to establish their interest in criminally forfeited property, and the fact that federal law decides what interests are subject to forfeiture. Third parties can argue that they held superior title at the time of the act giving rise to the forfeiture, or that they are bona fide purchasers for value. They cannot argue, however, that a state divorce court awarded them a special equity in the forfeited property; there is no "special equity provision" in section 853(n)(6).

The Sixth Circuit's timeline theory threatens completely to subordinate federal law not to state property law, but to state judges who are given carte blanche to decide what interests the United States – not even a party to the divorce proceeding – will be able to execute upon after the dissolution of the marriage, and to defendants who may collude with their spouses to avoid forfeiture. Under Leroy Lane II, for example, it is unclear why the defendant spouse would not be able to avoid forfeiture by simply giving his interest in the property to his spouse. The gift would destroy the tenancy, thereby removing the barrier to the government's execution of its lien, but there would be nothing left for the government to take. The gift would effectively defease not only the interest of the guilty spouse, but the interest of the government as well. See also Sharp, 520 So.2d at 10 (finding, for purposes of creditor rights, that an award of special equity has the same effect as if one spouse transferred his or her interest in the property to the other by quit-claim deed either before or at dissolution of the marriage).[34] This result was clearly not intended by Congress. The criminal forfeiture

---

[34] In the instant case, the district court found that the divorce court's award of a special equity to Mrs. Kennedy was justified under state law. What actually occurred, of course, is that the divorce court merely adopted the parties' agreement that Mrs. Kennedy should be granted all right, title, and interest in the Sunset Way property. We do not question the propriety of a state court's incorporation of a property settlement in a divorce decree; but it seems absurd to argue, as does Mrs. Kennedy, that divorcing spouses can act by agreement to defease the government of its lawful interest in forfeited property in a proceeding in which the government is not even a party.

provisions provide only two ways for third parties to establish their interest in forfeited property; and one of them is emphatically <u>not</u> that the criminal defendant gave the third party a gift. The relation back provision contained in 21 U.S.C. § 853(c), vesting all right, title, and interest in the forfeited property in the United States upon the commission of the acts giving rise to the forfeiture, was specifically included in section 853 as a way of avoiding such transfers. See <u>Ben-Hur</u>, 20 F.3d at 319; <u>Reckmeyer</u>, 836 F.3d at 203.

IV.

For the foregoing reasons, we REVERSE the district court's order granting Mrs. Kennedy's petition to establish her interest in the forfeited property, and REMAND with instructions that the district court reinstate the order of forfeiture.

REVERSED and REMANDED.